IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
June 11, 2020 Session

## HIGHLANDS PHYSICIANS, INC. v. WELLMONT HEALTH SYSTEM

**Appeal from the Law Court for Sullivan County (Kingsport)**
**No. C41368          E. G. Moody, Chancellor**

_____

### No. E2019-00554-COA-R3-CV

_____

In this class action lawsuit involving an association of physicians alleging breach of an agreement by the defendant hospital corporation, a three-week jury trial resulted in a verdict of more than $57 million in damages. The trial court denied the defendant's post-trial motions and subsequently awarded over $5 million in attorney's fees and expenses. The defendant has appealed. Determining that the trial court erred in failing to submit the attorney's fee issue to the jury, we vacate the award of attorney's fees and expenses and remand the issue to the trial court for determination by a jury. We affirm the trial court's judgment in all other respects.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed in Part, Vacated in Part; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and JOHN W. MCCLARTY, J., joined.

W. Brantley Phillips, Jr.; Russell E. Stair; and Matthew J. Sinback, Nashville, Tennessee, and W. Kyle Carpenter, J. Ford Little, and William F. Clayton, Knoxville, Tennessee, for the appellant, Wellmont Health System.

James G. O'Kane and Emily L. Herman-Thompson, Knoxville, Tennessee, and Gary M. Elden, Matthew C. Wolfe, and Peter O'Neill, Chicago, Illinois, for the appellee, Highlands Physicians, Inc.

### OPINION

### I. Factual and Procedural Background

This is the second appeal in this class action lawsuit. This Court's opinion in *Highlands Physicians, Inc. v. Wellmont Health Sys.*, No. E2017-01549-COA-R3-CV,

2017 WL 6623992, at *1-3 (Tenn. Ct. App. Dec. 28, 2017) ("*Highlands I*"), details the factual and procedural history of this matter up to the time of the first appeal as follows:

Plaintiff/Appellee Highlands Physicians, Inc. ("HPI") is a doctor-owned independent practice association consisting of healthcare providers whose practices are primarily located in Northeast Tennessee and Southwest Virginia. HPI's membership consists of about 1,500 physicians and other health care practitioners. The organization was formed to represent the interests of its physicians and their practices in negotiations and collaborative ventures with health care payors and hospitals. Wellmont is a Tennessee corporation that operates multiple hospitals and outpatient clinics in generally the same geographic area as HPI. Wellmont is also the successor by merger to Bristol Memorial Hospital, Inc. ("Bristol Hospital").

In 1993, HPI and Bristol Hospital, Wellmont's predecessor, formed what is now known as Highlands Wellmont Health Network (the "Network"). The Network is a Physician-Hospital Organization ("PHO"), which is a common type of organization formed between doctors and hospitals to promote objectives such as negotiating contracts with health insurance companies (also known as "payors"). Both HPI and Wellmont are fifty percent owners of the Network, and they are parties to a Stockholders Agreement ("SA") that governs the rights and obligations of the parties in the Network. In the original SA, Section 3 set forth each party's agreement to a "Covenant Not to Establish Entity Similar to the [Network]." In general, this section provided that the parties, their officers, their shareholders, and their members were prohibited from competing with the Network or soliciting the Network's payors. In 1995, Wellmont and HPI purportedly entered into an amendment of the SA (the "Amendment"), but the record is unclear as to whether either party has ever located a fully executed copy thereof. Whether the Amendment is valid and enforceable is not for determination on this appeal, but while the purported Amendment reiterated the parties' non-competition and non-solicitation agreement, it removed those duties from the officers, directors, shareholders, and members of HPI and Wellmont.

HPI and Wellmont operated well within the confines of the Network for several years. However, around 2011 or 2012, the senior leadership at Wellmont began to change, and the relationship between HPI and Wellmont deteriorated over the next few years. According to HPI, the new leadership at Wellmont took an adversarial position to HPI and HPI's members who were not employed by Wellmont. HPI sets forth a multitude of allegations in its verified complaint to support the proposition that, under

- 2 -

new leadership, Wellmont began to deliberately undermine HPI, dismantle the Network, and reduce resources previously devoted to maintaining clinical integration[FN] within the Network. HPI alleges that this had a detrimental effect on the Network's ability to maintain a high level of clinical integration. Additionally, HPI alleges that Wellmont unlawfully diverted two major insurance contracts from the Network to Wellmont individually. The first contract was entered into separately by Wellmont with Humana Medicare Advantage in June 2012 (the "Humana Contract"). HPI apparently considered litigation against Wellmont at that time but ultimately decided against it. The second contract was entered into separately by Wellmont and Cigna in 2014. HPI alleges that Wellmont aggressively solicited Cigna to make a separate deal with Wellmont, including telling Cigna that the Network and/or HPI were not sufficiently clinically integrated. HPI claims that these actions by Wellmont constitute a clear breach of the Stockholders Agreement and cost HPI and its members tens of millions of dollars in damages.

Based on the aforementioned conduct, HPI filed a verified complaint against Wellmont on February 2, 2016, for claims of breach of contract, declaratory and injunctive relief, breach of fiduciary duty, defamation, tortious interference with a business, and deceit of a third party. With respect to declaratory and injunctive relief, HPI requests that the trial court make the following declarations and enjoin Wellmont from taking any action inconsistent with such declarations:

1. The SA does not permit Wellmont to contract with an existing Network payor separately from the Network or solicit payors of the Network (except, if the Amendment is effective, as provided in its Section 3.2.2(i)).

2. In Section 3.2.2(i) of the Amendment, the phrase "managed care networks competing with" does not include a network that already includes the HPI-Wellmont Network.

3. By its conduct, Wellmont breached SA 3.

4. By its conduct, Wellmont has breached its fiduciary duties of care and loyalty to HPI.

5. By its conduct, Wellmont has committed an intentional tort damaging HPI and its members, as set out [in the complaint].

6.     Each shareholder must put the interest of the Network ahead of its own interest.

7.     Absent consent of both shareholders, neither shareholder may:  (i) divert for its own benefit a corporate opportunity of the Network; (ii) compete with the Network; or (iii) solicit any payor of the Network to contract with a shareholder separately from the Network.

8.     Each shareholder must comply with SA 4 procedures to call to the other's attention any potential legal or practical impediment to continuation of the Network or the SA and thereafter to arbitrate any issues on those subjects.

9.     Each shareholder must take all actions and invest all resources reasonably necessary to ensure that the activities of the Network, HPI and Wellmont remain lawful, ethical, and clinically integrated.

10.    Neither shareholder may retaliate against any witness or member of HPI:  (i) for participation in this lawsuit; (ii) for testimony given in this lawsuit; (iii) for cooperation with counsel to provide information for this lawsuit; or (iv) in general for advancing the interests of the Network or HPI in this lawsuit.

HPI filed a motion for class certification contemporaneously with its verified complaint.  HPI sought to certify a class of itself and each of its approximately 1,500 members.  HPI alleged that its members pay "tithes" to HPI based on the payments made to those members under the contracts HPI negotiates with payors on behalf of the members.  Therefore, any actions by Wellmont that caused harm to HPI would necessarily harm its members, and vice versa.

Wellmont filed an unverified answer to the complaint on April 4, 2016.  Later that month, Wellmont filed a motion in opposition to class certification.  HPI's motion for class certification was heard on June 7, 2016, and August 31, 2016.  At the hearing on June 7, 2016, the trial court heard the arguments of counsel for both sides but eventually agreed to give Wellmont time to take discovery on the issue of class certification.  On August 31, 2016, the court again heard arguments from counsel regarding class certification and ordered the parties to participate in mediation to

settle as many issues in the case as possible. At a status conference on February 24, 2017, the parties informed the court that the parties had been in direct communication without the aid of counsel and that the discovery process was still ongoing. On July 5, 2017, the court once again urged the parties to continue negotiations in an effort to resolve the case but stated that he would be ruling on HPI's motion for class certification within thirty days.

On July 27, 2017, the trial court granted HPI's motion, certifying the class of plaintiffs against Wellmont as: "All medical practitioners or practice groups who were members of Highlands Physician's Inc. for part or all of the period beginning June 22, 2012 through the date of this order." The court certified the class as to "all claims." The trial court found that the class satisfied the numerosity, commonality, typicality, and adequacy of representation requirements of Rule 23.01 of the Tennessee Rules of Civil Procedure. The trial court also concluded that HPI satisfied all three subparts of Rule 23.02 in order to maintain a class action. Further, the court held that HPI could proceed as a proper class representative on behalf of the class. Wellmont filed this interlocutory appeal regarding class certification.

[FN] According to the Network's 2011 Annual Report to its Members, the Network defined "clinical integration" as "individual providers cooperating in an interdependent fashion so they can pool infrastructure and resources to develop, implement, and monitor evidence-based protocols and various systematic processes, which enable them to furnish higher quality care in a more efficient manner." The Network's status as clinically integrated has legal consequences on its ability to negotiate contracts with payors on behalf of its shareholders.

(Other footnotes omitted.)

During the first appeal, Wellmont Health System ("Wellmont") raised issues concerning the propriety of the trial court's decision to certify the class. *Id*. at *3. This Court ultimately affirmed the trial court's determination that the requirements of Tennessee Rules of Civil Procedure 23.01 and 23.02 had been met, with the exception of Rule 23.02(1). *Id*. at *10. This Court therefore affirmed the trial court's grant of class certification. *Id*.

Wellmont filed an application for permission to appeal to the Tennessee Supreme Court pursuant to Tennessee Rule of Appellate Procedure 11. The High Court granted Wellmont's application "for the limited purpose of vacating in part the judgment of the

Court of Appeals and remanding the case to the trial court for further proceedings consistent with this order." *See Highlands Physicians, Inc. v. Wellmont Health Sys.*, No. E2017-01549-SC-R11-CV (Tenn. Mar. 14, 2018). The Court stated in pertinent part:

> Although the trial court concluded that class certification is maintainable under Rule 23.02(2), the resulting certification order contained no findings related to the considerations enumerated in *Meighan v. U.S. Sprint Communications Co.*, 924 S.W.2d 632 (Tenn. 1996) (indicating that class certification under Rule 23.02(2) is appropriate only in cases in which injunctive or declaratory relief is the predominant relief sought) and *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 361-362 (2011) (authorizing certification of a class under this subdivision only when the certifying court considers whether the claims for monetary relief are incidental to the requested injunctive or declaratory relief). We, therefore, vacate the portion of the judgment of the Court of Appeals that affirmed the trial court's finding that certification is appropriate under Rule 23.02(2). The balance of the judgment of the Court of Appeals, concluding that the trial court correctly determined that the prerequisites of Rule 23.01 had been met and that class certification was appropriate under Rule 23.02(3), is affirmed in all respects.

Following remand, Highlands Physicians, Inc. ("HPI") filed motions for summary judgment concerning certain issues of law, including interpretation of the Stockholders Agreement ("SA") and whether HPI members were third-party beneficiaries of the SA. Wellmont likewise filed motions for summary judgment concerning interpretation of the parties' contract, HPI's claims based on breach of fiduciary duty and intentional torts, and claims against separate legal entities associated with Wellmont.

Following the filing of extensive pleadings by both parties concerning the countervailing summary judgment motions, the trial court conducted a hearing on the motions on April 20, 2018. At the conclusion of the hearing, the trial court took the matters under advisement, stating:

> First of all, this is a very complex case, as everyone that's involved is well aware of. And in a case as complex as this, then I do not normally give oral decisions because there's too big of a chance that I'll miss something that's important.
>
> You all may not be aware -- I assume you are aware, but you may not be aware that I don't have a law clerk. So when I've got all these other cases, then I have to deal with all of them.

- 6 -

And I am sure you probably don't believe that I have any other cases as complicated as this one, or as sophisticated, but I do have. I have the opioid case, if you all are familiar with that. That's just as complicated, may end up being more complicated, and has a lot more attorneys. And it's on the front burner, too.

\* \* \*

So I'm not going to rule on any of these motions today. I'm going to wait until after mediation, and probably at that point I'm going to require both sides to do proposed findings of fact and conclusions of law and a proposed order, because that helps me. It helps me not to overlook any of the details that I need to consider.

On May 7, 2018, Wellmont filed proposed findings of fact and conclusions of law concerning the summary judgment motions, as well as a proposed order. HPI similarly filed proposed findings of fact and conclusions of law. Thereafter, HPI sought and received leave from the trial court to file an amended complaint, which added, *inter alia*, allegations that the 1996 amendment to the SA was effective and that Wellmont had negotiated in secret with Cigna dating back to 2011. Wellmont filed a response to the amended complaint on July 12, 2018.

HPI also sought to amend its expert witness disclosure to add Brant Kelch, HPI's Executive Director, as an expert witness concerning damages. HPI subsequently filed a motion seeking to bifurcate the trial with regard to liability and damages. On July 16, 2018, Wellmont filed additional motions for partial summary judgment opposing HPI's claims for "speculative" future damages and claims for damages based on breach of the network access agreement. Wellmont also sought to exclude recovery by HPI members who had joined HPI after the lawsuit was filed.

On July 20, 2018, Wellmont filed a motion seeking to decertify the class. Wellmont asserted that certain requirements, such as typicality and commonality, were not met. Wellmont subsequently filed various motions in limine as well as a motion to bifurcate the issue of punitive damages. HPI similarly filed motions in limine concerning evidentiary issues.

On September 4, 2018, the trial court entered an order regarding the pending summary judgment motions. In its order, the court granted HPI's two motions for summary judgment concerning interpretation of the SA, determining, *inter alia*, that (1) the SA prohibited Wellmont from competing with Highlands Wellmont Health Network ("PHO") for payors with existing PHO contracts and from soliciting such payors and (2) HPI members were third-party beneficiaries of the SA. The court denied Wellmont's

motions for partial summary judgment, attaching incorporated findings of fact and conclusions of law that were substantially similar to those proposed by HPI.

On September 4, 2018, Wellmont filed a motion seeking sanctions against HPI for its alleged concealment of documents related to its claims of clinical integration. Wellmont also filed motions seeking leave to amend its answer and to exclude or limit the testimony of Mr. Kelch. In turn, HPI filed motions seeking to compel arbitration and obtain a grant of summary judgment regarding Wellmont's counterclaims.

The trial court subsequently denied Wellmont's motion to decertify the class. Wellmont filed an amended answer on November 5, 2018, and HPI filed a motion for sanctions on November 9, 2018. Both parties filed numerous pleadings in support of their pending motions.

On November 26, 2018, the trial court entered an order denying Wellmont's motion to exclude Mr. Kelch's expert testimony related to damages. The court ordered that future damages would be limited to a three-year period. The court also entered an order granting HPI's motion to compel arbitration concerning its declaratory judgment claim and Wellmont's breach of contract counterclaim. Furthermore, all other issues were ordered to proceed to trial.

A jury trial in this matter, beginning the following day, November 27, 2018, concluded on December 18, 2018. The three-week trial involved numerous witnesses and over 200 exhibits. The jury ultimately returned a verdict in favor of HPI, determining that Wellmont had breached the 1996 amendment to the SA. The jury also found that Wellmont had breached its fiduciary duty to HPI and its members and had intentionally interfered with HPI's existing or prospective business relationships with Cigna and self-insured employers. The jury further determined that Wellmont had concealed material facts and had made intentional misrepresentations of material fact upon which HPI and its members reasonably relied to their detriment. In addition, the jury determined that Wellmont had breached the Network Access Agreement and that Wellmont Medical Associates and Wellmont Cardiology Services owed overdue tithes to HPI, for which Wellmont was responsible. The jury awarded HPI a total of $57,959,053 in damages.

On January 22, 2019, the trial court entered a judgment approving the jury's verdict. The parties filed a flurry of post-trial motions, including motions presented by HPI seeking awards of pre-judgment interest and attorney's fees and motions filed by Wellmont for a new trial or remittitur of the verdict. The trial court entered orders on March 26 and 28, 2019, denying most of the post-trial motions, except for its determination that HPI was entitled to an award of attorney's fees based on the language of the SA. Wellmont filed a timely notice of appeal on March 28, 2019. On the same

date, the trial court entered a restraining order against Wellmont prohibiting "conduct inconsistent" with the SA or retaliation against class members or witnesses. On May 22 and June 24, 2019, the trial court entered orders awarding to HPI, respectively, $4,185,567 in attorney's fees and $1,381,871 in expenses. Wellmont filed a supplemental notice of appeal on June 25, 2019. HPI filed a notice of appeal as well; however, inasmuch as Wellmont was the first party to file a notice of appeal, Wellmont has been designated as the appellant herein.

## II. Issues Presented[1]

Wellmont presents the following issues for our review, which we have restated as follows:

1. Whether the trial court erred by approving the jury's damages verdict in excess of $57,000,000 based on the testimony of HPI's damages expert.

2. Whether the trial court erred by declining to decertify the class based on Tennessee Rule of Civil Procedure 23.02(3).

3. Whether the trial court erred by granting partial summary judgment to HPI, particularly by (1) relying on parol evidence in its interpretation of the SA, (2) determining that HPI's members were third-party beneficiaries of the SA, (3) concluding that Wellmont could owe fiduciary duties to HPI's members, and (4) entering HPI's proposed order granting summary judgment without announcing its independent reasoning.

4. Whether the trial court erred by entering a judgment in favor of HPI despite an alleged lack of material evidence concerning HPI's claims for breach of the SA, breach of fiduciary duty, intentional interference with business relationships, intentional concealment, and intentional misrepresentation.

5. Whether the trial court erred by awarding $5,600,000 in attorney's fees and expenses to HPI, pursuant to the SA, when HPI failed to submit the issue of attorney's fees to the jury.

---

[1] The parties have raised a plethora of issues in this matter, which we have consolidated into several broad categories and reordered based upon the chronology of events. We have similarly delineated the applicable standards of review.

6. Whether the trial court erred by entering a restraining order against Wellmont that was overly broad, failed to contain required findings, and ignored another adequate and obvious remedy at law.

HPI's brief contains a combined statement of issues and standards of review, wherein HPI not only separated and restructured Wellmont's issues but also raised new issues. In the interest of clarity, we find it necessary to list only those issues wherein HPI seeks relief from this Court, which we have also restated as follows:

7. Whether the trial court erred by granting summary judgment in favor of Wellmont concerning the claims of class members who joined HPI after the lawsuit was filed.

8. Whether the trial court erred by denying prejudgment interest in favor of HPI.

9. Whether the trial court erred in the amount of attorney's fees awarded to HPI.

10. Whether HPI's fee agreement was "reasonable" under Tennessee Supreme Court Rule 8 and should be enforced.

### III.  Standard of Review

The grant or denial of a motion for summary judgment is a matter of law; therefore, our standard of review is *de novo* with no presumption of correctness. *See Rye v. Women's Care Ctr. of Memphis, MPLLC*, 477 S.W.3d 235, 250 (Tenn. 2015); *Dick Broad. Co. of Tenn. v. Oak Ridge FM, Inc.*, 395 S.W.3d 653, 671 (Tenn. 2013) (citing *Kinsler v. Berkline, LLC*, 320 S.W.3d 796, 799 (Tenn. 2010)).  As such, this Court must "make a fresh determination of whether the requirements of Rule 56 of the Tennessee Rules of Civil Procedure have been satisfied." *Rye*, 477 S.W.3d at 250.  As our Supreme Court has explained concerning the requirements for a movant to prevail on a motion for summary judgment pursuant to Tennessee Rule of Civil Procedure 56:

[W]hen the moving party does not bear the burden of proof at trial, the moving party may satisfy its burden of production either (1) by affirmatively negating an essential element of the nonmoving party's claim or (2) by demonstrating that the nonmoving party's evidence *at the summary judgment stage* is insufficient to establish the nonmoving party's claim or defense.  We reiterate that a moving party seeking summary judgment by attacking the nonmoving party's evidence must do more than make a conclusory assertion that summary judgment is appropriate on this

basis. Rather, Tennessee Rule 56.03 requires the moving party to support its motion with "a separate concise statement of material facts as to which the moving party contends there is no genuine issue for trial." Tenn. R. Civ. P. 56.03. "Each fact is to be set forth in a separate, numbered paragraph and supported by a specific citation to the record." *Id.* When such a motion is made, any party opposing summary judgment must file a response to each fact set forth by the movant in the manner provided in Tennessee Rule 56.03. "[W]hen a motion for summary judgment is made [and] . . . supported as provided in [Tennessee Rule 56]," to survive summary judgment, the nonmoving party "may not rest upon the mere allegations or denials of [its] pleading," but must respond, and by affidavits or one of the other means provided in Tennessee Rule 56, "set forth specific facts" *at the summary judgment stage* "showing that there is a genuine issue for trial." Tenn. R. Civ. P. 56.06. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.,* 475 U.S. [574,] 586, 106 S. Ct. 1348, [89 L.Ed.2d 538 (1986)]. The nonmoving party must demonstrate the existence of specific facts in the record which could lead a rational trier of fact to find in favor of the nonmoving party. If a summary judgment motion is filed before adequate time for discovery has been provided, the nonmoving party may seek a continuance to engage in additional discovery as provided in Tennessee Rule 56.07. However, after adequate time for discovery has been provided, summary judgment should be granted if the nonmoving party's evidence *at the summary judgment stage* is insufficient to establish the existence of a genuine issue of material fact for trial. Tenn. R. Civ. P. 56.04, 56.06. The focus is on the evidence the nonmoving party comes forward with at the summary judgment stage, not on hypothetical evidence that theoretically could be adduced, despite the passage of discovery deadlines, at a future trial.

*Rye*, 477 S.W.3d at 264-65. "Whether the nonmoving party is a plaintiff or a defendant—and whether or not the nonmoving party bears the burden of proof at trial on the challenged claim or defense—at the summary judgment stage, '[t]he nonmoving party must demonstrate the existence of specific facts in the record which could lead a rational trier of fact to find in favor of the nonmoving party.'" *TWB Architects, Inc. v. The Braxton, LLC*, 578 S.W.3d 879, 889 (Tenn. 2019) (quoting *Rye*, 477 S.W.3d at 265)). Pursuant to Tennessee Rule of Civil Procedure 56.04, the trial court must "state the legal grounds upon which the court denies or grants the motion" for summary judgment, and our Supreme Court has instructed that the trial court must state these grounds "before it invites or requests the prevailing party to draft a proposed order." *See Smith v. UHS of Lakeside, Inc.*, 439 S.W.3d 303, 316 (Tenn. 2014).

As our Supreme Court has explained concerning admissibility of expert testimony:

> Generally, questions pertaining to the qualifications, admissibility, relevancy, and competency of expert testimony are matters left to the trial court's discretion. *McDaniel* [*v. CSX Transp., Inc.*], 955 S.W.2d [257,] 263 [(Tenn. 1997)]. We may not overturn the trial court's ruling admitting or excluding expert testimony unless the trial court abused its discretion. *Id.* at 263-64. A trial court abuses its discretion if it applies an incorrect legal standard or reaches an illogical or unreasonable decision that causes an injustice to the complaining party. *State v. Stevens*, 78 S.W.3d 817, 832 (Tenn. 2002).

*Brown v. Crown Equip. Corp.*, 181 S.W.3d 268, 273 (Tenn. 2005).

Regarding the standard of review for class action certifications, this Court has previously elucidated:

> A trial court's decision on class certification is entitled to deference. *See Meighan v. U.S. Sprint Commc'ns Co.,* 924 S.W.2d 632, 637 (Tenn. 1996). The grant or denial of class certification is discretionary, and the court's decision will stand absent abuse of that discretion. *Id.* (citing *Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188, 1197 (6th Cir. 1988)). The abuse of discretion standard typically applies when a choice exists in the trial court among several acceptable alternatives. *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010) (citing *Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 708 (Tenn. Ct. App. 1999)). Because the trial court is vested with the responsibility to make that choice, a reviewing court cannot second-guess the lower court's judgment or merely substitute an alternative it finds preferable. *Id.* at 524 (citations omitted). A reviewing court must instead affirm the discretionary decision so long as reasonable legal minds can disagree about its correctness. *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001) (citing *State v. Scott*, 33 S.W.3d 746, 752 (Tenn. 2000); *State v. Gilliland*, 22 S.W.3d 266, 273 (Tenn. 2000)). The same principles apply here; a trial court's certification decision must stand if reasonable judicial minds can differ about the soundness of its conclusion. *Freeman v. Blue Ridge Paper Prod., Inc.*, 229 S.W.3d 694, 703 (Tenn. Ct. App. 2007) (citing *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 223 (Tenn. Ct. App. 1999)). "The abuse of discretion standard of review does not, however, immunize a lower court's decision from any meaningful appellate scrutiny." *Beecher*, 312 S.W.3d at 524 (citing *Boyd v. Comdata Network, Inc.*, 88 S.W.3d 203, 211 (Tenn. Ct. App. 2002)).

A trial court's discretion is not unbounded. *Cf. Gulf Oil Co. v. Bernard*, 452 U.S. 89, 100, 101 S. Ct. 2193, 68 L. Ed .2d 693 (1981). A trial court must consider controlling legal principles and relevant facts when making a discretionary decision. *Beecher*, 312 S.W.3d at 524 (citing *Konvalinka v. Chattanooga-Hamilton Cnty. Hosp. Auth.*, 249 S.W.3d 346, 358 (Tenn. 2008); *Ballard v. Herzke*, 924 S.W.2d 652, 661 (Tenn. 1996)). A trial court abuses its discretion if it (1) applies an incorrect legal standard, (2) reaches an illogical or unreasonable decision, or (3) bases its decision on a clearly erroneous evaluation of the evidence. *Elliott v. Cobb,* 320 S.W.3d 246, 249-50 (Tenn. 2010) (citation omitted); *see also Walker v. Sunrise Pontiac-GMC Truck, Inc.*, 249 S.W.3d 301, 308 (Tenn. 2008) (citation omitted). Additionally, a trial court abuses its discretion if it "strays beyond the applicable legal standards or when it fails to properly consider the factors customarily used to guide the particular discretionary decision." *Beecher*, 312 S.W.3d at 524 (citing *State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007)).

Appellate courts review a trial court's discretionary decision to determine "(1) whether the factual basis for the decision is properly supported by evidence in the record, (2) whether the lower court properly identified and applied the most appropriate legal principles applicable to the decision, and (3) whether the lower court's decision was within the range of acceptable alternative dispositions." *Id.* at 524-25 (citing *Flautt & Mann v. Council of Memphis*, 285 S.W.3d 856, 872-73 (Tenn. Ct. App. 2008)). We review the trial court's legal conclusions *de novo* with no presumption of correctness. *Id.* at 525 (citing *Johnson v. Nissan N. Am., Inc.*, 146 S.W.3d 600, 604 (Tenn. Ct. App. 2004); *Boyd v. Comdata Network, Inc.*, 88 S.W.3d 203, 212 (Tenn. Ct. App. 2002)). We review the trial court's factual conclusions under the preponderance of the evidence standard. *Id.* (citations omitted).

*Rogers v. Adventure House LLC*, No. E2019-01422-COA-R3-CV, 2020 WL 4932853, at *3-4 (Tenn. Ct. App. Aug. 24, 2020).

Concerning review of a jury verdict, our Supreme Court has stated that "[a]ppellate courts are limited to determining whether there is material evidence to support the jury's verdict. Where the record contains material evidence supporting the verdict, the judgment based on that verdict will not be disturbed on appeal." *Reynolds v. Ozark Motor Lines, Inc.*, 887 S.W.2d 822, 823 (Tenn. 1994). To determine whether the record contains material evidence to support a verdict, the appellate court must review the record and "take the strongest legitimate view of all the evidence in favor of the verdict, assume the truth of all evidence that supports the verdict, allow all reasonable inferences

- 13 -

to sustain the verdict, and discard all countervailing evidence." *Akers v. Prime Succession of Tenn., Inc.*, 387 S.W.3d 495, 501 (Tenn. 2012) (quoting *Barkes v. River Park Hosp., Inc.*, 328 S.W.3d 829, 833 (Tenn. 2010)). Moreover, "[w]e do not re-weigh the evidence, and do not recalibrate the jury's preponderance of the evidence assessment. The credibility of witnesses is the province of the jury, not appellate courts." *Ferguson v. Middle Tenn. State Univ.*, 451 S.W.3d 375, 380 (Tenn. 2014) (internal citations omitted).

This Court reviews a trial court's decision concerning attorney's fees according to an abuse of discretion standard. *See Wright ex rel. Wright v. Wright*, 337 S.W.3d 166, 176 (Tenn. 2011). The Supreme Court has similarly explained the standard by which this Court must review an award of prejudgment interest:

> An award of prejudgment interest is within the sound discretion of the trial court and the decision will not be disturbed by an appellate court unless the record reveals a manifest and palpable abuse of discretion. *Spencer v. A-1 Crane Service, Inc.*, 880 S.W.2d 938, 944 (Tenn. 1994); *Otis v. Cambridge Mut. Fire Ins. Co.*, 850 S.W.2d 439, 446 (Tenn. 1992). This standard of review clearly vests the trial court with considerable deference in the prejudgment interest decision. Generally stated, the abuse of discretion standard does not authorize an appellate court to merely substitute its judgment for that of the trial court. Thus, in cases where the evidence supports the trial court's decision, no abuse of discretion is found.

*Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 927 (Tenn. 1998).

We also note that Tennessee Rule of Appellate Procedure 3(e) provides in pertinent part:

> [I]n all cases tried by a jury, no issue presented for review shall be predicated upon error in the admission or exclusion of evidence, jury instructions granted or refused, misconduct of jurors, parties or counsel, or other action committed or occurring during the trial of the case, or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived.

## IV. Summary Judgment Rulings

Wellmont raises various sub-issues related to the overarching issue of whether the trial court's pretrial grant of partial summary judgment to HPI was appropriate. Wellmont postulates that the trial court (1) failed to enforce the plain language of the SA, (2) misapplied the summary judgment standard when reviewing parol evidence, (3)

applied the wrong state's law regarding the question of whether HPI's members were third-party beneficiaries of the SA, (4) erred by determining that Wellmont could owe fiduciary duties to HPI's members, and (5) erred by granting summary judgment in favor of HPI and adopting HPI's proposed findings of fact and conclusions of law without first announcing the basis for the rulings and its independent reasoning. Inasmuch as the latter sub-issue concerning the propriety of the summary judgment procedure employed by the trial court may be determinative of the other sub-issues, we will address it as a threshold determination.

A. Summary Judgment Procedure

Wellmont contends that because the trial court failed to announce its own reasoning before adopting HPI's proposed findings of fact and conclusions of law, the court failed to perform its duty, pursuant to Tennessee Rule of Civil Procedure 56.04, such that its summary judgment rulings should be vacated. HPI counters that Wellmont, by its subsequent actions, waived its ability to object to the summary judgment procedure employed by the trial court.

Tennessee Rule of Civil Procedure 56.04 provides in pertinent part: "The trial court shall state the legal grounds upon which the court denies or grants the [summary judgment] motion, which shall be included in the order reflecting the court's ruling." As our Supreme Court has explained concerning this requirement:

> [T]he resolution of issues relating to a trial court's compliance or lack of compliance with Tenn. R. Civ. P. 56.04 should . . . take into consideration the fundamental importance of assuring that a trial court's decision either to grant or deny a summary judgment is adequately explained and is the product of the trial court's independent judgment.

*Smith*, 439 S.W.3d at 314.

In *Smith*, the trial court conducted a hearing concerning the defendant's summary judgment motion and orally ruled in favor of the defendant at the conclusion of the hearing. *See id*. at 311. The court then directed the defendant's counsel to "prepare the order and to establish the rationale for the [c]ourt's ruling in quite specific detail" without stating the basis for its ruling. *See id*. Upon appeal, this Court vacated the trial court's summary judgment ruling. *See id*. The Supreme Court ultimately affirmed this Court's ruling. *See id*. at 318.

Our Supreme Court in *Smith* scrutinized the practice of trial courts' requesting counsel to prepare orders, findings of fact, and conclusions of law, stating:

Like many federal courts and other state courts, we continue to adhere to the view that findings of fact, conclusions of law, opinions, and orders prepared by trial judges themselves are preferable to those prepared by counsel. We likewise share the concern expressed by federal courts and other state courts about the practice of courts adopting verbatim findings of fact, conclusions of law, opinions, and orders prepared by counsel for the prevailing party. For example, the United States Supreme Court has criticized federal trial courts for their "verbatim adoption of findings of fact prepared by prevailing parties, particularly when those findings have taken the form of conclusory statements unsupported by citation to the record." *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 572, 105 S. Ct. 1504, 84 L.Ed.2d 518 (1985). Expressing concerns similar to those expressed by this Court over seventy years earlier, the Court noted "the potential for overreaching and exaggeration on the part of attorneys preparing findings of fact when they have already been informed that the judge has decided in their favor." *Anderson v. City of Bessemer City*, N.C., 470 U.S. at 572, 105 S. Ct. 1504.

* * *

In the almost thirty years since *Anderson* was decided, most courts have approved, but not recommended, the practice of trial courts receiving and using party-prepared findings of fact, conclusions of law, and orders as long as two conditions are satisfied. First, the findings and conclusions must accurately reflect the decision of the trial court. Second, the record must not create doubt that the decision represents the trial court's own deliberations and decision. Accordingly, reviewing courts have declined to accept findings, conclusions, or orders when the record provides no insight into the trial court's decision-making process, or when the record "casts doubt" on whether the trial court "conducted its own independent review, or that the opinion is the product of its own judgment," *Bright v. Westmoreland Cnty.*, 380 F.3d [729,] 732 (3rd Cir. 2004).

There are, to be sure, acceptable reasons for permitting trial courts to request the preparation of proposed findings of fact, conclusions of law, and orders. They can promote the expeditious disposition of cases, and they may, when used properly, assist the trial court in placing the litigants' factual and legal disputes in sharper focus. In the final analysis, the ultimate concern is the fairness and independence of the trial court's judgment.

- 16 -

*Id*. at 314-16 (emphasis added) (other internal citations and footnotes omitted). The *Smith* Court concluded that "Tenn. R. Civ. P. 56.04 requires the trial court, upon granting or denying a motion for summary judgment, to state the grounds for its decision before it invites or requests the prevailing party to draft a proposed order." *Id*. at 316.[2] Therefore, in *Smith*, the High Court determined that vacating the trial court's summary judgment order was necessary because the trial court did not articulate any grounds for its decision prior to asking the prevailing party's counsel to draft the order "establish[ing] the rationale for the [c]ourt's ruling." *See id*. at 318.

Subsequent cases decided by this Court have applied the rule articulated in *Smith* to matters (1) not involving summary judgment and/or (2) wherein the trial court's directive to draft a proposed order or findings was extended to both parties rather than just the prevailing party. *See Cunningham v. Eastman Credit Union*, No. E2019-00987-COA-R3-CV, 2020 WL 2764412, at *2 (Tenn. Ct. App. May 27, 2020) (vacating the trial court's order and remanding for further proceedings based on the trial court's adoption of one party's proposed findings of fact and conclusions of law almost verbatim after taking the matter under advisement without issuing a ruling and after asking both sides to file proposals); *Mitchell v. Mitchell*, No. E2017-00100-COA-R3-CV, 2019 WL 81594, at *7 (Tenn. Ct. App. Jan. 3, 2019) (same); *Deberry v. Cumberland Elec. Membership Corp*., No. M2017-02399-COA-R3-CV, 2018 WL 4961527, at *2 (Tenn. Ct. App. Oct. 15, 2018) (same); *In re Dakota M*., No. E2017-01855-COA-R3-PT, 2018 WL 3022682, at *6 (Tenn. Ct. App. June 18, 2018) (determining that the trial court's order did "not allow us to conclude that the order was the result of the court's 'own considered conclusions'" because the court made no findings on the record and the findings in the order were substantially the same as the allegations in the termination petition); *In re Colton B*., No. M2017-00997-COA-R3-PT, 2017 WL 6550620, at *5 (Tenn. Ct. App. Dec. 22, 2017) ("Given the nearly identical recitation of facts contained in the petition and the final order, coupled with the trial court's sparse oral ruling, we must conclude that the record 'casts doubt' as to whether the trial court exercised its independent judgment in this case." (citing *Smith*, 439 S.W.3d at 316)).

---

[2] As the *Smith* Court explained via footnote:

> A trial court may comply with this requirement in a number of ways. First, the trial court may state the grounds for its decision at the same time it announces its decision on the record. Second, the trial court may announce its decision and inform counsel that it will provide the grounds in a subsequently filed memorandum or memorandum opinion. Third, after announcing its decision, the trial court may notify the parties of the grounds for its decision by letter, as long as the letter has been provided to all parties and has been made part of the record.

*See Smith*, 439 S.W.3d at 317 n.28.

- 17 -

In the case at bar, both parties filed pretrial motions for partial summary judgment concerning certain claims. The trial court conducted a hearing on the motions on April 20, 2018. At the conclusion of the hearing, the trial court took the matters under advisement, inviting the parties to file proposed findings of fact and conclusions of law, stating that such practice would help the court in "not . . . overlook[ing] any of the details that [it] need[ed] to consider." Both parties filed such proposals.

On September 4, 2018, the trial court entered an order deciding the partial summary judgment motions, stating in relevant part:

> The Findings of Fact and Conclusions of Law Regarding the Parties' Cross-Motions for Summary Judgment attached hereto as Exhibit A are hereby adopted and incorporated by reference as if fully set forth herein.
>
> The Findings of Fact and Conclusions of Law Regarding Wellmont's Motions for Summary Judgment on (1) Fiduciary Duty, (2) Intentional Torts, and (3) Responsibility for Subsidiaries, Counts II, V, and VII, attached hereto as Exhibit B, are hereby adopted and incorporated by reference as if fully set forth herein.
>
> The Court GRANTS HPI's two motions for summary judgment on contract interpretation. The Court FINDS AND DECLARES:
>
> a.    SA § 3.2.2 prohibits Wellmont from competing with HWHN for payors with existing HWHN contracts and from soliciting such payors, and the exception in SA § 3.2.2(i) for "competing" networks allows only competition for and solicitation of persons or entities which do not have networks comprised of HWHN personnel.
>
> b.    HPI members are third-party beneficiaries of SA § 3.
>
> c.    Wellmont's two motions for partial summary judgment on these issues are denied.
>
> Wellmont's three motions for partial summary judgment on whether Wellmont owes [HPI] fiduciary duties; whether Wellmont's intentional conduct caused damages; and whether Wellmont may be liable for debts owed or acts performed by wholly-owned Wellmont subsidiaries are DENIED. For the reasons set out in Exhibit B, with respect to the issues raised in those motions, there are genuine issues of disputed material facts that must be decided by the jury.

- 18 -

(Paragraph numbering omitted.) The findings of fact and conclusions of law attached to the trial court's order were substantially the same as the proposed findings and conclusions filed by HPI.

We recognize that, at first blush, the procedure utilized by the trial court in this matter of adopting proposed findings and conclusions almost verbatim appears substantially similar to the procedure criticized by this state's appellate courts in *Smith* and its progeny. Significant distinctions from *Smith* exist, however. In the instant case, the trial court did not adopt the proposal of a party who had already learned that it would prevail on the motion; rather, the court invited both parties to submit proposals. Furthermore, the grant of summary judgment herein did not effectively conclude the case at the trial court level as it did in *Smith*.

Setting aside the summary judgment posture, this matter is more similar to the circumstances in *Cunningham*, *Mitchell*, and *Deberry* in that the trial court took the matter under advisement without announcing a ruling for either side and then invited both parties to draft proposed findings and conclusions, from which the court ultimately chose one party's proposal and adopted it. An important distinction still exists, however, between the case at bar and the aforementioned opinions because in *Smith* and the cases that followed, the court's order adopting one party's proposal was a final judgment that concluded the trial court proceedings. Here, the trial court's order granting summary judgment merely narrowed the issues for trial rather than concluding the proceedings. Moreover, the parties had more than two months to seek alteration or clarification of the court's partial summary judgment rulings before proceeding to a three-week trial regarding the remaining issues. As such, Wellmont clearly maintained the faculty to object to the summary judgment rulings and to seek alteration or amendment of those rulings by the trial court. This matter proceeded to a three-week trial followed by months of post-trial motions. We determine that this is a significant distinction from *Smith* and the subsequent similar opinions of this Court.

HPI contends that Wellmont waived its ability to object to the procedure employed by the trial court in granting partial summary judgment by failing to object thereto except during an "emergency appeal" filed during trial. HPI further asserts that Wellmont cannot object to the summary judgment procedure because Wellmont agreed that portions of the summary judgment ruling could be read to the jury. HPI insists that Wellmont has lain "in the weeds" respecting this issue and complied with the procedure utilized by the trial court without objection, resulting in a waiver of its opportunity to do so on appeal.

We note that HPI has cited no authority for its argument that Wellmont's actions led to a waiver of this sub-issue, and this Court has been unable to locate any such authority. We further note that despite HPI's waiver assertions, Wellmont did explicitly

raise the issue in its application seeking an extraordinary appeal, pursuant to Tennessee Rule of Appellate Procedure 10, filed on November 27, 2018, as acknowledged by the trial court's March 28, 2019 order concerning Wellmont's motion for new trial. We therefore find HPI's waiver argument to be unavailing.

Assuming, *arguendo*, that the trial court's procedure in this matter constituted a violation of Rule 56.04, we note that such a violation "is not reversible error *under all circumstances*." *Coffman v. Armstrong Int'l, Inc.*, No. E2017-00062-COA-R3-CV, 2019 WL 3287067, at *4 (Tenn. Ct. App. July 22, 2019) (citing *Huggins v. McKee*, 500 S.W.3d 360, 366-67 (Tenn. Ct. App. 2016)). In *Huggins v. McKee*, the trial court conducted a hearing concerning a motion for summary judgment and concluded the hearing without ruling, taking the matter under advisement. 500 S.W.3d 360, 366 (Tenn. Ct. App. 2016). Both parties filed proposed findings and conclusions, and the trial court sent an email to counsel for the movant, asking that counsel "draw an order granting [to the prevailing party] summary judgement [sic] and incorporating [that party's proposed] findings and conclusions[.]" *Id*. The nonmovant appealed, contending that the resulting order was not the product of the trial court's own independent legal reasoning and judgment based on the Supreme Court's ruling in *Smith*. *Id*.

As the *Huggins* Court elucidated regarding this procedure:

We agree that the trial court's practice in this case is not fully compliant with either the letter or the spirit of *Smith*. To be sure, the better practice would have been for the trial court to either make an oral ruling or to draft its own order rather than adopting verbatim the proposed findings and conclusions of [the movant]. We also realize, however, that this case has been awaiting resolution for nearly a decade and was previously remanded to the trial court because the trial court failed to offer an appropriate basis for its prior dismissal. As the *Smith* Court explained, "judicial economy supports the Court of Appeals' approach to the enforcement of Tenn. R. Civ. P. 56.04 [i.e., "conduct[ing] archeological digs" to discern the basis for the trial court's judgment] in proper circumstances when the absence of stated grounds in the trial court's order does not significantly hamper the review of the trial court's decision." *Id*. at 314. Additionally, under similar circumstances, this Court has held that in the absence of evidence to the contrary, this Court will "assume that the order approved and entered by the trial court accurately represents the court's reasoning." *In re Estate of Kysor*, No. E2014-02143-COA-R3-CV, 2015 WL 9465332, at *6 (Tenn. Ct. App. Dec. 28, 2015) (citing only pre-*Smith* cases to support this ruling). In the interest of providing the parties to this case a final resolution of the issues, we exercise our discretion to proceed to consider the merits of this appeal, but we caution litigants and

trial courts that we may not choose to do so under similar circumstances in the future.

*Id*. at 366-67.

Similarly, here, we determine that the trial court's summary judgment procedure, although not ideal, does not require that the summary judgment order be vacated. We conclude that the circumstances of the case at bar are distinguishable from those found in *Smith* and its progeny. We further conclude that this case, which has been pending for several years and during which the parties have had the benefit of a lengthy jury trial, thousands of pages of pleadings filed, and a prior appeal, presents a proper case for this Court to exercise its discretion to consider the merits of the issues on appeal.

### B. Summary Judgment Rulings

Wellmont argues that the summary judgment rulings were erroneous because the trial court (1) misconstrued the language of the SA and (2) applied the wrong state's law when determining that HPI's members were third-party beneficiaries of the SA. We will address each of these arguments in turn.

### 1. Interpretation of SA and Amendment and Non-Competition Provisions

The parties agree that the SA is governed by Delaware law. Delaware law requires that the trial court "accept and apply the plain meaning of an unambiguous term in the context of the contract language and circumstances[.]" *See Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 740 (Del. 2006). Accordingly, the "true test is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant." *Id*. (quoting *Rhone-Poulenc Basic Chems Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992)). However, "[w]hen the provisions in controversy are fairly susceptible of different interpretations or may have two or more different meanings, there is ambiguity. Then the interpreting court must look beyond the language of the contract to ascertain the parties' intentions." *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997).

The pertinent provisions of the SA at issue state:

3.1     Exclusivity.

     3.1.1     The [PHO] shall serve as the exclusive managed care organization of HPI and Wellmont Health System ("Wellmont"). HPI and Wellmont shall not sanction, endorse or otherwise promote

- 21 -

any other managed care organization as the managed care organization of HPI or Wellmont.

3.2     Covenant Not to Compete.

3.2.1   During the term of this Agreement HPI and Wellmont shall not directly or indirectly: (i) compete with the [PHO] in the geographic area set forth in Amended Exhibit 3, attached to the Amendment to Stockholders Agreement dated as of July 1, 1996, or solicit the [PHO's] payors or referral sources referring payors of the [PHO]; nor (ii) become a partner, shareholder or investor in, or in any manner otherwise own, establish or operate an entity which competes with the [PHO] in the geographic area set forth in Amended Exhibit 3 or solicit the [PHO's] payors or referral sources referring payors of the [PHO] for any such entity.

3.2.2   The foregoing prohibition against competition and solicitation shall not: (i) preclude HPI, Wellmont, and individual stockholders or participating providers of HPI from entering into contracts to provide services in managed care networks competing with the [PHO]; nor (ii) restrict a party's right to conduct general marketing and advertising efforts to persons generally in the relevant geographic market; nor (iii) pertain to the independent practice associations in existence as of the Effective Date made up of physicians on the medical staff of Holston Hospital.

In its September 4, 2018 summary judgment order, the trial court ruled that § 3.2.2 prohibited Wellmont from competing with the PHO for "payors with existing [PHO] contracts and from soliciting such payors," and that the exception stated in § 3.2.2 "allows only competition for and solicitation of persons or entities which do not have networks composed of [PHO] personnel." In its attached findings, the trial court determined that the parties' intent, shown by the language used in subsection 3.2.1, was to prohibit one another from "competing with [the PHO] for its payors, from soliciting such payors, from becoming part of an entity which competes with [the PHO] and/or solicits [the PHO's] payors, and from sanctioning, endorsing, or promoting an organization that competes with [the PHO]." The court then found that the exception stated in subsection 3.2.2 meant that "Wellmont can contract with networks that do not have existing contracts with [the PHO]" or that "are not staffed by [PHO] personnel."

Although the trial court made the above findings "based solely on contract language," the court proceeded to consider extrinsic evidence concerning the parties' intent in the form of an affidavit filed by attorney Doug Elden, HPI's counsel who had

negotiated and drafted the sections of the SA at issue. The court stated that this information was "highly relevant to the Court's interpretation of the SA to the extent the Court finds the SA ambiguous," noting that it was considering such information in accordance with the Delaware Supreme Court's ruling in *Eagle Indus., Inc.*, 702 A.2d at 1232-33.

In *Eagle*, the issue focused on the proper interpretation of a stock purchase agreement executed by the parties. *Id*. at 1228. As the Delaware Supreme Court explained:

> Contract terms themselves will be controlling when they establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language. When the provisions in controversy are fairly susceptible of different interpretations or may have two or more different meanings, there is ambiguity. Then the interpreting court must look beyond the language of the contract to ascertain the parties' intentions. . . .
>
> If a contract is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract or to create an ambiguity. But when there is uncertainty in the meaning and application of contract language, the reviewing court must consider the evidence offered in order to arrive at a proper interpretation of contractual terms. This task may be accomplished by the summary judgment procedure in certain cases where the moving party's record is not *prima facie* rebutted so as to create issues of material fact. If there are issues of material fact, the trial court must resolve those issues as the trier of fact.
>
> In construing an ambiguous contractual provision, a court may consider evidence of prior agreements and communications of the parties as well as trade usage or course of dealing.

*Id*. at 1232-33 (footnotes omitted).

In the case at bar, although the trial court initially stated that it was basing its ruling on the SA's plain language, the trial court ultimately determined that ambiguity existed in the SA's provisions such that consideration of extrinsic evidence was necessary "to the Court's interpretation of the SA to the extent the Court finds the SA ambiguous." We agree with the trial court that the provisions at issue are ambiguous and susceptible to more than one meaning. For example, subsection 3.2.1 states that neither HPI nor Wellmont will directly or indirectly compete with the PHO or solicit the PHO's payors within a certain geographic area. Subsection 3.2.2 then states that "the foregoing

prohibition against competition and solicitation" would not preclude Wellmont, HPI, or HPI's participating providers from agreeing to "provide services in managed care networks competing with [the PHO]." Although a plain reading of these provisions would appear to render them in conflict, Wellmont argues that this is exactly the way the provisions should be read, with the language of the specific exception found in subsection 3.2.2 taking priority over the general language found in subsection 3.2.1.

In contrast, HPI asserts that the only reasonable interpretation of subsection 3.2.2 is that Wellmont and HPI could enter into contracts with networks that did not have existing contracts with the PHO and were not staffed by PHO personnel. To find otherwise, according to HPI, would destroy the intent of subsection 3.2.1 and eviscerate the parties' longstanding covenant not to compete.

As demonstrated by the parties' diametrically opposed points of view concerning the interpretation of subsection 3.2.2, we conclude that the provision is ambiguous. We therefore also conclude that the trial court did not err in considering parol evidence concerning the "prior agreements and communications of the parties as well as trade usage or course of dealing" in interpreting this provision. *See Eagle Indus.*, 702 A.2d at 1232-33.

We further note that we review the trial court's conclusions of law, including its interpretation of a written agreement, *de novo* with no presumption of correctness. *See Ray Bell Constr. Co., Inc. v. State, Tenn. Dep't of Transp.*, 356 S.W.3d 384, 386 (Tenn. 2011). Based on our *de novo* review of the evidence presented, we conclude that the trial court properly interpreted the SA and its 1996 amendment.

As part of its pretrial pleadings, HPI filed an affidavit from Doug Elden, the HPI attorney who negotiated and drafted the SA in 1993 as well as the 1996 amendment.[3] Mr. Elden articulated that he had worked with physician-hospital organizations for many years and was familiar with the industry and the parties' concerns regarding competition and anti-trust issues. Mr. Elden indicated that in early 1993, he had advised HPI to incorporate in order to limit liability for members, and he also related that he had advised HPI to join or form a physician-hospital organization in the fall of 1993. According to Mr. Elden, HPI followed his advice on both counts.

Mr. Elden explained that the purpose of a physician-hospital organization was to "enhance medical care in the community, to enhance the effectiveness of [physician] members, to improve coordination between physicians and hospitals," and ultimately to

---

[3] We acknowledge that on appeal, "[w]e review the materials before the trial court at the time it heard the motion for summary judgment." *Truitt v. Palmer*, No. M2003-02757-COA-R3-CV, 2005 WL 2217084, at *4 (Tenn. Ct. App. Sept. 12, 2005).

achieve clinical integration, which he defined as improving community health and effectiveness by operating as an integrated unit. According to Mr. Elden, by forming a PHO, the physicians and hospitals who partnered together could negotiate with payors as a unit and share the cost of hiring experienced specialists to handle payor contract negotiations, a capability that solo practitioners and small physician groups did not possess. Mr. Elden further elaborated that in order to motivate physicians to invest their time and effort into a physician-hospital organization, the physicians would have to be assured that the hospital, as a larger entity that could more easily contract with payors, would not divert payors to deal solely with the hospital. In other words, the SA, in Mr. Elden's opinion, needed to contain provisions that would prohibit the hospital from serving its own interests at the expense of the PHO. Mr. Elden accordingly negotiated such a clause in the SA, contained in section 3.

Regarding the 1996 amendment to the SA, Mr. Elden explained that the parties wished to retain the same agreement concerning non-competition but that due to the impending merger between Wellmont's predecessor, Bristol Regional Medical Center, and Holston Hospital, as well as Wellmont's desire for the PHO to survive the merger, Mr. Elden was requested to assist in drafting an amendment to the SA. The purposes of the amendment were to enable Wellmont to move forward with the merger and to allow the newly merged entity the ability to continue dealing with Holston's physicians who were not HPI members. Mr. Elden stated that he had also learned that there were certain payors who refused to contract with the PHO such that Wellmont and HPI needed the ability to contract with those payors outside the PHO.

Accordingly, Mr. Elden elucidated that the language in subsection 3.2.2 (i) was intended to apply to entities that did not maintain existing contracts with the PHO. Mr. Elden explained that the parties would and did understand the phrase, "networks competing with the [PHO]," as meaning those networks that did not have existing PHO contracts. Mr. Elden affirmed that the major purpose of section 3 was to prevent Wellmont from later diverting PHO payors to itself and that this purpose was understood by both parties and was unchanged by the 1996 amendment. The parol evidence presented by HPI clearly supported the trial court's interpretation of the language of the SA as amended.

Wellmont claims that in considering this parol evidence, the trial court misapplied the summary judgment standard by affording HPI "the benefit of every doubt" even though HPI was the moving party. *See Eskin v. Bartee*, 262 S.W.3d 727, 732 (Tenn. 2008) ("We consider the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in the non-moving party's favor."). In its September 4, 2018 order granting partial summary judgment in favor of HPI, however, the trial court noted that Wellmont had provided no countervailing evidence concerning the history of contract negotiation and drafting between the parties. Indeed, in Wellmont's appellate

brief, Wellmont points to no such contradictory evidence concerning negotiation and drafting of the SA. We note that pursuant to Tennessee Rule of Civil Procedure 56.06:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but his or her response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

The trial court further explained that it could also consider the fact that a prudent person in HPI's position would not have agreed to language supporting the interpretation urged by Wellmont. Wellmont argues that this was error because the trial court failed to consider whether "a prudent person in Wellmont's position would have entered the [SA] under HPI's reading of § 3." Wellmont posits that it would have been "impossible" for the court to conclude in the affirmative because under HPI's interpretation of §3, only Wellmont is bound by the non-competition clause. We disagree. Subsections 3.1.1, 3.2.1, and 3.2.2 clearly state that both Wellmont and HPI are bound by those provisions. Wellmont's arguments in this regard are therefore unavailing.

## 2. Interpretation of SA and Third-Party Beneficiaries

Wellmont contends that the trial court erred by interpreting the SA as providing benefits to non-signing third parties, namely the medical providers who were HPI members. According to Wellmont, the trial court inappropriately applied the law of Tennessee rather than Delaware when making this determination.

In its September 4, 2018 partial summary judgment order, when ruling on HPI's claim that its members were third-party beneficiaries of the SA, the trial court referenced the law of both Tennessee and Delaware, determining that both states' laws were consistent concerning this issue. Although the parties have conceded that Delaware law governs the SA based upon its choice-of-law provision, we are in accord with the trial court's ultimate conclusion that Delaware law mandated a determination that the HPI members were third-party beneficiaries of the SA.[4]

Delaware courts have long recognized third-party beneficiary claims so long as certain requirements are met. *See, e.g.*, *Browne v. Robb*, 583 A.2d 949, 954-55 (Del.

---

[4] In both Delaware and Tennessee, the law of the state selected by the choice-of-law provision contained in the subject contract determines whether a third-party beneficiary obtains enforceable rights under the contract. *See Vichi v. Koninklijke Philips Elecs., N.V.*, 85 A.3d 725, 771 n.310 (Del. Ch. 2014); *see also Vest v. Duncan-Williams, Inc.*, No. M2003-02690-COA-R3-CV, 2004 WL 1056741, at *3 (Tenn. Ct. App. May 4, 2004).

1990); *Insituform of N. Am., Inc. v. Chandler*, 534 A.2d 257, 268 (Del. Ch. 1987). In *Insituform*, the Delaware Court of Chancery explained the requirements for proving such a claim as follows:

> Analysis of the standing issue begins with recognition of the general rule that strangers to a contract ordinarily acquire no rights under it unless it is the intention of the promisee to confer a benefit upon such third party. *See generally* 2 *Williston on Contracts* § 356 (1959); 4 *Corbin on Contracts* §§ 772, 774 (1951). The developed law has characterized persons who, while not being parties to a contract, nonetheless benefit from its performance in one of three ways: as donee beneficiaries, as creditor beneficiaries and as incidental beneficiaries. *Restatement of Contracts* § 133 (1932); *see generally Restatement of Contracts (Second)* Sec. 302 (1979). It is universally recognized that where it is the intention of the promisee to secure performance of the promised act for the benefit of another, either as a gift or in satisfaction or partial satisfaction of an obligation to that person, and the promisee makes a valid contract to do so, then such third person has an enforceable right under that contract to require the promisor to perform or respond in damages. *See generally Blair v. Anderson*, Del. Supr., 325 A.2d 94 (1974); *Astle v. Wenke*, Del. Supr., 297 A.2d 45 (1972); *Oliver B. Cannon & Sons, Inc. v. Dorr-Oliver, Inc*., Del. Super., 312 A.2d 322 (1973); *Insurance Company of North America v. Waterhouse*, Del. Super., 424 A.2d 675 (1980). If, however, it was not the promisee's intention to confer direct benefits upon a third person, but rather such third party happens to benefit from the performance of the promise either coincidentally or indirectly, then such third party beneficiary will be held to have no enforceable rights under the contract.

*Insituform*, 534 A.2d at 268-69. The *Insituform* Court further elucidated:

> In order for third party beneficiary rights to be created, not only is it necessary that performance of the contract confer a benefit upon third parties that was intended, but the conferring of a beneficial effect on such third party—whether it be a creditor of the promisee or an object of his or her generosity—should be a material part of the contract's purpose.

*Id*. at 270.

Three years later, the Delaware Supreme Court similarly instructed:

> The Delaware courts clearly recognize that a third party "beneficiary" may sue to collect damages for breach of contract. *See Blair*

*v. Anderson*, Del. Supr., 325 A.2d 94, 96 (1974); *Astle v. Wenke*, Del. Supr., 297 A.2d 45, 47 (1972). Third party beneficiaries generally fall into two classes including donee beneficiaries and creditor beneficiaries. *See* 4 A. CORBIN, CORBIN ON CONTRACTS § 774, at 6 (1951). A donee beneficiary has someone else's performance donated to him as a gift secured by the promisee's consideration. *Id.* A person becomes a creditor beneficiary when the promisee owes a duty or liability to the beneficiary and the promisee secures a contract with another party whose performance satisfies the obligation to the beneficiary. *Id.* at 6-7. . . .

Delaware courts recognize third party standing to sue in contract under the creditor beneficiary theory standard when the promisee owes some legal duty to the third party, *see Pajewski v. Perry*, Del. Supr., 363 A.2d 429, 431 (1976) (no standing because promisee owed no duty to third party beneficiary), and there is some merit to [the plaintiff's] claim under Delaware law. *See Blair*, 325 A.2d at 96. . . . The [*Blair*] Court found that the prisoner was a creditor beneficiary because the promisee, the federal government, owed a statutory duty to protect and safeguard its own prisoners. *Id. See* 4 A. CORBIN, supra, § 787, at 97 (creditor "may properly be used broadly to include any obligee to whom the promisee owes a duty"). . . .

Professor Corbin recognized the difficulty in categorizing third parties as either creditor, donee or incidental beneficiaries. *See* 4 A. CORBIN, supra, § 779C, at 41. He suggested that courts are less willing to recognize third party standing when their contract interests become more complex and the third party group becomes larger and more poorly defined. *Id.* § 779G, at 53-54. The question of whether a third party has standing to enforce a contract as a creditor beneficiary ultimately involves a question of the promisee's intent to confer a benefit on the third party. *See* 4 A. CORBIN, supra, § 776, at 20.

*Browne v. Robb*, 583 A.2d 949, 954-55 (Del. 1990) (footnote omitted). In two cases involving this issue that were decided by the Delaware Superior Court later that same year, the court discussed both the intention of the <u>parties</u> to confer a benefit and whether the <u>promisee</u> intended to secure performance for the benefit of another as being determinative of the claims. *See Delmar News, Inc. v. Jacobs Oil Co.*, 584 A.2d 531, 534 (Del. Super. Ct. 1990); *Guardian Const. Co. v. Tetra Tech Richardson, Inc.*, 583 A.2d 1378, 1386 (Del. Super. Ct. 1990).

In 1993, the Delaware Supreme Court was again confronted with a third-party beneficiary claim as it generally, yet solely, discussed the "intention of the contracting

parties" as "[e]ssential to a third party's right of enforceability." *Triple C Railcar Serv., Inc. v. City of Wilmington*, 630 A.2d 629, 633 (Del. 1993). Because of this general statement in *Triple C*, the Delaware Court of Chancery later noted the existence of "conflicting precedent as to whether the requisite intent must be of the parties to the contract or of the promisee individually," citing and comparing, *inter alia*, *Triple C* and *Insituform. See Comrie v. Enterasys Networks, Inc.*, 29 Del. J. Corp. L. 911, at *3 n.23 (Del. Ch. Feb. 17, 2004).[5] Based on *Triple C* and other cited cases, Wellmont argues that the trial court herein erred by solely relying on HPI's intent as promisee when determining whether HPI's members were third-party beneficiaries of the SA.

We emphasize, however, that in its September 4, 2018 partial summary judgment order, the trial court made specific findings concerning the third-party beneficiary issue. The court found that HPI existed to benefit its members and that HPI "intended to benefit its members by entering into the SA." Importantly, the court made the additional finding that "[a]ll evidence offered as to Wellmont's intent [was] consistent" with HPI's in this regard. The evidence in the record supports this finding. Both Doug Elden and Dr. Nelson Gwaltney, the former president of HPI, stated in their affidavits that the intent of entering into the SA to form the PHO was so that the PHO could negotiate contracts with payors on behalf of Wellmont and HPI and its members as a single entity. Mr. Elden specifically explained:

> The main reasons to form a PHO are to enhance medical care in the community, to enhance the effectiveness of [HPI] members, to improve coordination between physicians and hospital(s), by that to enable the PHO to achieve "clinical integration" . . . thereby to enable the PHO to negotiate for hospital(s) and physicians as a unit.

Mr. Elden further indicated that for "maximum protection of HPI members," the SA "should include a section that spelled out in a clear detailed way non-competition and

---

[5] Subsequent cases from the Delaware Court of Chancery and Superior Court have stated the following three requirements for a determination of third-party beneficiary status:

> (1) an intent between the contracting parties to benefit a third party through the contract, (2) the benefit being intended to serve as a gift or in satisfaction of a pre-existing obligation to the third party, and (3) a showing that benefiting the third party was a material aspect to the parties agreeing to contract.

*United Health All., LLC v. United Med., LLC*, No. CV 7710-VCP, 2014 WL 6488659, at *4 (Del. Ch. Nov. 20, 2014). *See also State Dep't of Transp. v. Figg Bridge Engineers, Inc.*, No. CIV.A. S11C-01-031 RFS, 2011 WL 5593163, at *2 (Del. Super. Ct. Nov. 9, 2011) (citing Restatement (Second) of Contracts § 302). Tennessee similarly follows the approach set forth in Restatement (Second) of Contracts § 302 (1979). *See, e.g.*, *Owner-Operator Indep. Drivers Ass'n, Inc. v. Concord EFS, Inc.*, 59 S.W.3d 63, 70 (Tenn. 2001).

non-solicitation obligations." According to Mr. Elden, when negotiating with Wellmont concerning the SA, Wellmont "expressed no disagreement and [he] concluded we shared the understandings" on these points. Again, Wellmont has directed us to no countervailing evidence presented at the summary judgment stage concerning its intent. *See* Tenn. R. Civ. P. 56.06. For the foregoing reasons, we affirm the trial court's grant of partial summary judgment in favor of HPI regarding this issue.

### 3. Interpretation of the SA and Fiduciary Duties

Wellmont also argues that the trial court erred by declining to grant summary judgment in its favor concerning the issue of whether Wellmont owed fiduciary duties to HPI's members. Wellmont raised this issue in a motion for partial summary judgment, which the court denied in its September 4, 2018 summary judgment order.

Wellmont posits that the question of whether a fiduciary duty exists is a question of law to be resolved by the court. The trial court explained in its summary judgment order, however, that HPI had asserted various bases for determining that it was owed a fiduciary duty, all of which were dependent upon certain factual findings. Regarding the fiduciary duty issue, the trial court specifically stated that "there are genuine issues of disputed material facts that must be decided by the jury." As this Court has often held, "the denial of a summary judgment motion predicated upon existence of a genuine issue of fact is not reviewable where there has been a judgment rendered after the trial on the merits of a case." *Klosterman Dev. Corp. v. Outlaw Aircraft Sales, Inc.*, 102 S.W.3d 621, 636 (Tenn. Ct. App. 2002). We therefore decline to review this issue.

### 4. Post-Complaint Class Members

HPI asserts that the trial court erred by granting summary judgment in favor of Wellmont as to the claims of class members who joined HPI after this lawsuit was filed because no evidence or authority supported such ruling. At a motion hearing conducted on August 16, 2018, Wellmont argued that summary judgment should be granted in its favor concerning the claims of 151 HPI members who joined HPI after February 2, 2016, the date upon which the initial complaint in this matter was filed, but before July 27, 2017, the date upon which the class was certified. The court orally granted summary judgment on those members' claims "in the interest of justice," noting that this issue should have been settled when the class definition was determined. From our review of the record and the parties' briefs, it appears that no written order was ever entered memorializing this ruling.

HPI argues on appeal that no authority existed for barring the claims of those 151 members. Wellmont asserts that the trial court's ruling was correct because those members were unaffiliated with HPI during the time period within which Wellmont's

alleged improper actions occurred.  Wellmont further urges that once the complaint was filed, any member who joined HPI thereafter would have had constructive knowledge of the lawsuit and no expectation of "receiving the rates previously obtained through agreements that were no longer in place."

As the trial court noted in its oral ruling, this question is more properly addressed as one of class definition and certification.  Ergo, in our discretion, we choose to address this issue in a subsequent section regarding analysis of the class certification.

## V.  Damages Testimony

Wellmont asserts that the trial court erred by admitting the testimony of Brant Kelch concerning damages, contending that his testimony was speculative and unreliable. Wellmont therefore argues that the jury had no basis for its damages verdict in this matter.  HPI contends that Mr. Kelch's opinions were properly admitted pursuant to Tennessee Rules of Evidence 701 and 702.  Moreover, HPI posits that if Mr. Kelch's testimony concerning damages were properly admitted pursuant to Rule 701, this Court would not need to address Wellmont's issue regarding whether Mr. Kelch's testimony was properly admitted as expert testimony pursuant to Rule 702.  Insofar as we agree with this reasoning, we will first address whether Mr. Kelch's testimony was proper pursuant to Rule 701.

Tennessee Rule of Evidence 701 provides:

(a)     Generally. If a witness is not testifying as an expert, the witness's testimony in the form of opinions or inferences is limited to those opinions or inferences which are

(1)     rationally based on the perception of the witness and

(2)     helpful to a clear understanding of the witness's testimony or the determination of a fact in issue.

(b)     Value. A witness may testify to the value of the witness's own property or services.

As this Court has previously elucidated:

In accordance with Tenn. R. Evid. 701, the fact that a witness is not qualified as an expert witness does not prevent that witness from rendering an opinion, so long as the court determines that the testimony is based on

the perception of the witness and is helpful to an understanding of the testimony or the determination of the facts at issue.

*Smartt v. NHC Healthcare/McMinnville, LLC*, No. M2007-02026-COA-R3-CV, 2009 WL 482475, at *18 (Tenn. Ct. App. Feb. 24, 2009). For example, Rule 701(b) expressly permits a property owner to provide an opinion concerning the value of his or her property. *See State ex rel. Smith v. Livingston Limestone Co., Inc.*, 547 S.W.2d 942, 943 (Tenn. 1977); *Haynes v. Cumberland Builders, Inc.*, 546 S.W.2d 228, 234 (Tenn. Ct. App. 1976). Tennessee's appellate courts have also allowed evidence to be introduced, pursuant to Rule 701, consisting of a corporate managing officer's opinion with respect to the market value of the corporation's real property, *see id*. at 943-44, or the testimony of a company owner concerning the value of his business, *see Delta Gypsum, LLC v. Felgemacher*, No. E2016-01447-COA-R3-CV, 2017 WL 1505612, at *6 (Tenn. Ct. App. Apr. 26, 2017). Our courts have also clarified, however, that "[a]lthough an 'owner' of real property is deemed to have special knowledge about his property to offer an opinion as to its value, the owner's opinion will be given little weight when founded upon pure speculation." *See Airline Constr. Inc. v. Barr*, 807 S.W.2d 247, 256 (Tenn. Ct. App. 1990). "There must be some evidence, apart from mere ownership, that this 'value' is a product of reasoned analysis." *Id*.

In support of its argument that Mr. Kelch's testimony was properly admitted pursuant to Rule 701, HPI relies on a decision from the Sixth Circuit Court of Appeals wherein a breach of contract action was analyzed pursuant to Tennessee law. *See Lativafter Liquidating Tr. v. Clear Channel Commc'ns, Inc.*, 345 Fed. Appx. 46, 51, 2009 WL 2514066, at *4-5 (6th Cir. 2009).[6] In that case, the plaintiff corporation, Eon, sought damages for the alleged diminution in Eon's market value due to a breach of contract by the defendant corporation, Clear Channel. *Id*. When an issue was raised on appeal concerning whether the trial court should have allowed a lay witness to testify concerning Eon's diminished market value, the Sixth Circuit explained:

---

[6] As our Supreme Court has recognized, "[a]lthough federal judicial decisions 'interpreting rules similar to our own are persuasive authority for purposes of construing the Tennessee rule,' they 'are non-binding even when the state and federal rules are identical.'" *Webb v. Nashville Area Habitat for Humanity, Inc*., 346 S.W.3d 422, 430 (Tenn. 2011) (quoting *Harris v. Chern*, 33 S.W.3d 741, 745 n.2 (Tenn. 2000)). With regard to this case, we note that Tennessee Rule of Evidence 701 is different from Federal Rule of Evidence 701 due to Tennessee's exclusion of the third requirement for admissibility of a lay opinion listed in the federal rule—that the opinion is "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Furthermore, Federal Rule of Evidence 701 does not contain the language concerning value testimony found in Tennessee Rule of Evidence 701(b).

Grady Vanderhoofven is a venture capitalist, the Executive Vice-President of Southern Appalachian Fund (which invested in Eon), and was a member of Eon's board. Vanderhoofven testified that Eon's value would have been $57 million with the Clear Channel contract, instead of the $17 million it sold for in 2006. As an investor in Eon, Vanderhoofven in 2005 investigated Eon's financials, retaining a market research firm to verify Eon's market potential. When he became a member of Eon's board in March 2005, he received Eon's monthly financial reports, including income statements, balance sheets, and cash flow statements. Vanderhoofven testified that between June 2004 and June 2005, the number of stations Eon was streaming increased by over 500%. After June 2005, however, the revenue from Clear Channel began to dwindle, and Vanderhoofven determined that Clear Channel was moving its streaming business to another company. Vanderhoofven based his $57 million valuation on the revenue Clear Channel had been generating for Eon prior to the discontinuation of their business, and the projection for the 12-month period prior to Eon's sale.

\* \* \*

Clear Channel contends that even if diminished-value damages are allowed in this setting, they cannot be proven without expert testimony, and that Vanderhoofven's testimony as a lay opinion witness under Federal Rule of Evidence 701 was improper. "'We review for abuse of discretion a district court's evidentiary rulings, including rulings on witness testimony under Rule[ ] 701 . . . of the Federal Rules of Evidence.'" *United States v. White*, 492 F.3d 380, 398 (6th Cir. 2007) (quoting *JGR, Inc. v. Thomasville Furniture Indus., Inc.*, 370 F.3d 519, 524 (6th Cir. 2004)). That Rule provides:

> If the witness is not testifying as an expert, the witness'[s] testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness'[s] testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Fed. R. Evid. 701. The advisory commission notes to the 2000 amendments to Rule 701 provide:

> [M]ost courts have permitted the owner or officer of a business to testify to the value or projected profits of the business, without the necessity of qualifying the witness as an accountant, appraiser, or similar expert. *See, e.g., Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153 (3d Cir. 1993) (no abuse of discretion in permitting the plaintiff's owner to give lay opinion testimony as to damages, as it was based on his knowledge and participation in the day-to-day affairs of the business). Such opinion testimony is admitted not because of experience, training or specialized knowledge within the realm of an expert, but because of the particularized knowledge that the witness has by virtue of his or her position in the business.

*Id*. (emphasis added).

> As an investor who researched Eon's financial condition, and later as a member of Eon's board, Vanderhoofven had personal, particularized knowledge of Eon's value. The district court did not abuse its discretion in permitting him to testify about Eon's projected value if it had retained Clear Channel's business. Moreover, contrary to Clear Channel's assertions, Vanderhoofven's testimony rested on a sufficient foundation—his personal research into Eon's financial reports.

*Id*. at *4-5.

HPI asserts that Mr. Kelch, much like the lay witness in *Lativafter*, was qualified to testify regarding damages because he had managed HPI for many years, had negotiated a great number of contracts on HPI's behalf, and was familiar with HPI's day-to-day operations. We determine, however, that the circumstances presented by the case at bar are significantly different from those presented in *Lativafter*. Although Mr. Kelch was clearly familiar with the internal operations of HPI, its contracts, and its finances, Mr. Kelch did not calculate or otherwise determine the $3.792 million damages figure for 2014 based upon his own knowledge, understanding, or perception. Rather, as he admitted in his testimony, he adopted this number wholesale from a calculation performed by employees of Cigna.

Mr. Kelch's damages chart concerning the "Cigna Fee for Service Reduction," introduced as Chart 1 of Exhibit 348, purports to project the damages suffered by HPI members in the years following the loss of Cigna's contract with the PHO, which caused those members to enter into direct contracts with Cigna at lower rates of reimbursement than those they enjoyed through the PHO contract. Mr. Kelch testified, and his chart

- 34 -

expressly represents, that he incorporated the damages figure for 2014 from a number provided by Cigna that purportedly represented its estimated savings for 2014 following termination of its contract with the PHO. Mr. Kelch then used that aggregate figure as a basis for his calculations in all subsequent years.

Matthew Ungs, the Vice-President of Network Management for Cigna, testified that he helped prepare a letter that was transmitted to HPI's counsel in 2018 regarding Cigna's estimated savings after termination of the PHO contract. The letter stated in relevant part, "Professional compensation rates decreased in aggregate by 17.3 percent or by 3.792 million under new agreements established directly between Cigna and each professional practice after the PHO agreement ended." Mr. Kelch acknowledged that he used the $3.792-million figure as a basis for calculating the damages to HPI members in 2014 and subsequent years.

When questioned regarding the source of the $3.792-million calculation, Mr. Ungs testified that it originated from a "spreadsheet and underlying analytics that were supported by our medical economics team with our contracting team specifically around the recontracting initiative." When pressed for further explanation, Mr. Ungs replied as follows:

> Wellmont's Counsel: Do I understand that what Cigna did was, it compared the 2013 rates for those practices with the 2014 rates and determined that those rates had decreased by an average or an aggregate of 17.3 percent?
>
> Mr. Ungs: In essence, yes. I mean, it really ties back to whether it's particularly, you know, calendar year 2013 or 2014. I'm not a hundred percent certain on. But it does tie back to, we looked at the prevailing rates that were applicable under the PHO agreement and compared to what the new -- the contracted rates were when we signed a direct agreement with the practice. And those -- that 17.3 percent, 3.792 million is the aggregate impact of those practices that moved from the -- you know, of the impact of the compensation between the practices moving from the PHO compensation to the directly contracted rates. And it's an annual number.
>
> Wellmont's Counsel: All right.

| Mr. Ungs: | It's estimated on an annual number. But I'm not certain if it ties back to exactly the calendar year '13, '14 or not. |
|---|---|
| Wellmont's Counsel: | Okay. But the 3.729 percent (sic) is a number calculated using the baseline of services in the network and assuming that those same services occurred the year after you entered into separate contracts with the providers; is that correct? |
| Mr. Ungs: | That's correct. That 3.792 is a million-dollar estimate, not a percentage. But you correctly stated it otherwise. |

Mr. Ungs's testimony clarifies that the $3.792-million number was a calculation estimated by a team employed by Cigna. Moreoever, Mr. Ungs, as the designated representative of Cigna, was not completely sure of its origin. This number was not calculated by Mr. Kelch or anyone employed by or associated with HPI; was not derived from HPI's records or those of its members; and was not in any way predicated upon Mr. Kelch's knowledge, understanding, or perception due to his employment with HPI or his experience in the healthcare field. In other words, the damages figure was neither the result of "the particularized knowledge that the witness has by virtue of his or her position in the business" nor Mr. Kelch's "personal research into [HPI's] financial reports." *See Lativafter*, at *5.[7]

Similarly, with respect to the direct employer contracts that the PHO purportedly lost to Cigna, Mr. Kelch stated that he computed the monetary losses to HPI and its members by utilizing a reimbursement rate of 119%, which he indicated was also premised upon Cigna's $3.792-million annual savings figure. As such, the only evidence presented by Mr. Kelch regarding damages that was founded upon his knowledge by virtue of his position with HPI was the information contained in Chart 7 of Exhibit 348 concerning network access damages and Mr. Kelch's testimony regarding tithes owed by Wellmont Medical Associates and Wellmont Cardiology Services. With respect to these two categories of damages, Mr. Kelch represented that the numbers he presented were derived from documentation that was available to him as Executive Director of HPI. We therefore conclude that as to these two categories of damages, network access damages

---

[7] Although we recognize that Mr. Kelch claimed that he was unable to obtain damages numbers directly from HPI members due to "antitrust issues," we find HPI's claim in this regard somewhat disingenuous because HPI's exhibits demonstrate that Mr. Kelch was aware of particular physician reimbursement rates in certain instances and because HPI has acknowledged that such information could be sought by counsel or a third party under a protective order without running afoul of antitrust considerations.

and tithes owed by Wellmont Medical Associates and Wellmont Cardiology Services, Mr. Kelch's testimony was properly admitted pursuant to Tennessee Rule of Evidence 701. Regarding the other rubric of damages, however, Mr. Kelch's testimony could not be properly admitted pursuant to Rule 701 because it was not founded on his own personal knowledge or information known to him in his position.

Based on this conclusion, we must determine whether the trial court properly allowed Mr. Kelch to testify as an expert, pursuant to Rules 702 and 703, with respect to the class members' damages based primarily upon Cigna's estimated savings. In a pretrial order entered on November 26, 2018, the trial court found Mr. Kelch to be qualified as an expert and expressly ruled that he could "testify as to damages [HPI] alleges that it and the class have suffered through the date of trial, and three years into the future." With regard to expert testimony, Tennessee Rule of Evidence 702 provides:

> If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise.

As our Supreme Court has elucidated, "the qualifications, admissibility, relevancy and competency of expert testimony are matters which largely rest within the sound discretion of the trial court." *State v. Ballard*, 855 S.W.2d 557, 562 (Tenn. 1993). We reiterate that a trial court "abuses its discretion if it applies an incorrect legal standard or reaches an illogical or unreasonable decision that causes an injustice to the complaining party." *Brown*, 181 S.W.3d at 275.

Concerning the basis for an expert's opinion, Rule 703 provides:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence. Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect. The court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness.

As our Supreme Court has previously explained, "[a] trial court should admit the testimony of a competent expert unless the party opposing the expert's testimony shows

that it will not substantially assist the trier of fact or if the facts or data on which the opinion is based are not trustworthy pursuant to Rules 702 and 703." *Shipley v. Williams*, 350 S.W.3d 527, 551 (Tenn. 2011). The High Court has further elucidated:

> In *McDaniel* [*v. CSX Transp., Inc*., 955 S.W.2d 257, 263 (Tenn. 1997)], we listed several nonexclusive factors that courts could consider in determining the reliability of scientific testimony, including
>
> > (1) whether scientific evidence has been tested and the methodology with which it has been tested; (2) whether the evidence has been subjected to peer review or publication; (3) whether a potential rate of error is known; (4) whether . . . the evidence is generally accepted in the scientific community; and (5) whether the expert's research in the field has been conducted independent of litigation.
>
> 955 S.W.2d at 265; *see also Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579, 593-94, 113 S. Ct. 2786, 125 L.Ed.2d 469 (1993) (applying the first four factors in determining the reliability of scientific expert testimony pursuant to the Federal Rules of Evidence); *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995) (considering on remand the fifth factor in addition to the first four factors). The *McDaniel* factors also may be applied to nonscientific expert testimony. [*State v.*] *Stevens*, 78 S.W.3d [817,] 834 [(Tenn. 2002)]; *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) (holding that a trial court may consider the *Daubert* factors in assessing the reliability of nonscientific expert testimony in accordance with the Federal Rules of Evidence).
>
> In addition to the *McDaniel* factors, we have identified other nondefinitive factors that a trial court may consider in assessing the reliability of an expert's methodology. One such factor is the expert's qualifications for testifying on the subject at issue. *Stevens*, 78 S.W.3d at 835. This factor is applicable particularly where the expert's personal experience is essential to the methodology or analysis underlying his or her opinion. We, however, caution that using this factor as the sole basis of reliability would result in a reconsideration of the Rule 702 requirement that the expert witness be qualified by knowledge, skill, experience, training, or education to express an opinion within the limits of the expert's expertise. As a result, the expert testimony would become "perilously close to being admissible based upon the ipse dixit of the expert." Robert J. Goodwin, *The Hidden Significance of Kumho Tire Co. v. Carmichael: A*

*Compass for Problems of Definition and Procedure Created by Daubert v. Merrell Dow Pharmaceuticals, Inc*., 52 Baylor L.Rev. 603, 635 (2000); *see Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S. Ct. 512, 139 L. Ed. 2d 508 (1997) (cautioning against the admission of expert testimony that is connected to existing data only through the "ipse dixit of the expert"). Furthermore, the trial court should distinguish between "'the marginally-qualified full-time expert witness who is testifying about a methodology that she has not employed in real life' and 'the highly credentialed expert who has devoted her life's work to the actual exercise of the methodology upon which her testimony is based.'" Sarah Brew, *Where the Rubber Hits the Road: Steering the Trial Court Through a Post-Kumho Tire Evaluation of Expert Testimony*, 27 Wm. Mitchell L. Rev. 467, 486 (2000).

Another factor that we have identified is the connection between the expert's knowledge and the basis for the expert's opinion. *Stevens*, 78 S.W.3d at 835. The purpose of this factor is to ensure that an "analytical gap" does not exist between the data relied upon and the opinion offered. *Id*.; *see Gen. Elec. Co*., 522 U.S. at 146, 118 S. Ct. 512 (holding that experts, who opined that the plaintiff's exposure to certain chemicals and toxins in the workplace contributed to his cancer, relied upon studies that either were too dissimilar to the facts of the case or failed to link the cancer with the chemical exposure). This factor is important particularly when the expert's opinions are based upon experience or observations as these areas are not easily verifiable. *Stevens*, 78 S.W.3d at 834. A trial court, however, may conclude that an expert's opinions are reliable "if the expert's conclusions are sufficiently straightforward and supported by a 'rational explanation which reasonable [persons] could accept as more correct than not correct.'" *Id*. (quoting *Wood v. Stihl*, 705 F.2d 1101, 1107-08 (9th Cir. 1983)).

We continue to emphasize, however, that these factors are non-exclusive and that a trial court need not consider all of these factors in making a reliability determination. Rather, the trial court enjoys the same latitude in determining how to test the reliability of an expert as the trial court possesses in deciding whether the expert's relevant testimony is reliable. *Kumho Tire Co*., 526 U.S. at 152, 119 S. Ct. 1167. The objective of the trial court's gatekeeping function is to ensure that "an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id*. Furthermore, upon admission, expert testimony will be subject to vigorous cross-examination and countervailing proof. *Stevens*, 78 S.W.3d at 835;

*McDaniel*, 955 S.W.2d at 265. The weight of the theories and the resolution of legitimate but competing expert opinions are matters entrusted to the trier of fact. *See McDaniel*, 955 S.W.2d at 265.

*Brown*, 181 S.W.3d at 274-75.

In this matter, HPI demonstrated that Mr. Kelch held significant experience in the healthcare industry with more than forty years of relevant work history. During that time period, Mr. Kelch had been employed by a number of hospitals, insurance companies, and other organizations in the healthcare field, in addition to his work as Executive Director of HPI. Mr. Kelch testified that during his tenure at HPI, he had been involved in negotiating and implementing more than fifty payor contracts. Furthermore, Mr. Kelch expressed considerable familiarity with the procedures and financial concerns associated with such contracts.

In determining the losses suffered by HPI and its members, Mr. Kelch utilized a monetary figure provided by Cigna, which was described as the "aggregate impact of those practices that moved from the . . . PHO compensation [rate] to the directly contracted rates." Although the $3.792-million annual savings estimate was calculated by Cigna, it is well settled that experts may base their opinions on information provided to them by others. *See Duran v. Hyundai Motor Am., Inc.*, 271 S.W.3d 178, 197 (Tenn. Ct. App. 2008). Mr. Kelch explained during his testimony that he believed this calculated sum represented a "minimum" amount of damages sustained by HPI members, which would account for any potential discrepancy caused by HPI members' opting out of the class. The number was calculated by an independent third party, which would contribute to its trustworthiness. Mr. Kelch further explained how he utilized this number to make other calculations included in his charts by employing "simple arithmetic."

This Court has previously clarified that although damages may not be based on "speculation or conjecture," damages "become too speculative only when the existence of damages is uncertain, not when the precise amount is uncertain." *Waggoner Motors, Inc. v. Waverly Church of Christ*, 159 S.W.3d 42, 57 (Tenn. Ct. App. 2004). As such, "the evidence required to support a claim for damages need only prove the amount of damages with reasonable certainty." *Id*. As the *Waggoner* Court further explained:

Once an injured party proves that it has been damaged, the amount of the damages need not be proved with certainty or mathematical precision. After the fact of damages had been established, less certainty is required with regard to the amount of the damages. The amount of lost profits damages may be based on estimates. While definite proof regarding the amount of damages is desirable as far as it is reasonably possible, it is

- 40 -

even more desirable that an injured party not be deprived of compensation merely because it cannot prove the extent of the harm suffered with complete certainty. This principle is based on the policy that defendants should not be permitted to complain about the lack of exactness or precision in the proof regarding the amount of damages when their wrongdoing created the damages in the first place.

An award for lost profits damages depends on whether the evidence provides a satisfactory basis for estimating what the injured party's probable earnings and expenses would have been had the wrongdoing not occurred. Since lost profits can rarely be computed down to the last penny, the evidence needed to support an award for lost profits need only provide a reasonable or rational basis for calculating what the lost profits would have been.

*Id*. at 58-59 (internal citations omitted).

In the case at bar, HPI's entitlement to damages was determined by the jury. Regarding the amount of damages sought, Mr. Kelch computed damages by utilizing a sum representing Cigna's aggregate annual savings based on Cigna's ability to contract directly with providers rather than contracting with the PHO as a whole. Mr. Kelch demonstrated that he was qualified, through his vast work experience, to provide an opinion on this matter and testified concerning the connection between his experience and knowledge and the basis for his opinion. *See Brown*, 181 S.W.3d at 274-75. We do not determine that the trial court, as gatekeeper, "applie[d] an incorrect legal standard or reache[d] an illogical or unreasonable decision that cause[d] an injustice to the complaining party" by allowing Mr. Kelch's testimony regarding damages. *See id*. at 273. We further note that ultimately, the "weight given to an expert's conclusion is for the jury, not the court." *Freeman v. Blue Ridge Paper Prods., Inc.*, 229 S.W.3d 694, 710 (Tenn. Ct. App. 2007). We therefore determine Wellmont's issue concerning Mr. Kelch's testimony to be without merit.

## VI. Class Certification

Wellmont argues that the trial court erred by refusing to decertify the class, pursuant to Tennessee Rule of Civil Procedure 23.02(3), because HPI failed to prove classwide damages based on a demonstrated injury to the class. HPI contends that the trial court erred by granting summary judgment in favor of Wellmont concerning the claims of class members who joined HPI after this lawsuit was filed because no evidence or authority supports this ruling. We will address each of these issues in turn.

As this Court has previously explained:

Rule 23.01 permits class certification if

> (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interest of the class.

Tenn. R. Civ. P. 23.01. The proponent of class certification must demonstrate compliance with each of Rule 23.01's requirements. *Walker* [*v. Sunrise Pontiac-GMC Truck, Inc*.,] 249 S.W.3d [301,] 307-08 [(Tenn. 2008)].

The proponent must next establish the class action is maintainable under Rule 23.02. *Id.* at 308. In contrast to Rule 23.01, the proponent of class certification must establish only one Rule 23.02 basis for the maintenance of a class action. *Id.* Rule 23.02 provides three bases for class action certification:

> (1) the prosecution of separate actions by or against individual members of the class would create a risk of
>
> > (a) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or
> >
> > (b) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or would substantially impair or impede their ability to protect their interest; or
>
> (2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or

(3)     the court finds that the question of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (a) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (b) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (c) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (d) the difficulties likely to be encountered in the management of a class action.

Tenn. R. Civ. P. 23.02. Class certification is permissible only if the proponent demonstrates compliance with both Rule 23.01 and Rule 23.02.

*Wofford v. M.J. Edwards & Sons Funeral Home Inc.*, 528 S.W.3d 524, 537-39 (Tenn. Ct. App. 2017) (quoting *Roberts v. McNeill*, No. W2010-01000-COA-R9-CV, 2011 WL 662648, at *3-5 (Tenn. Ct. App. Feb. 23, 2011)).

Both this Court and the Supreme Court have affirmed the trial court's determination that the requirements of Tennessee Rule of Civil Procedure 23.01 were met concerning the class in this litigation. Moreover, both Courts have affirmed that class certification was appropriate under Rule 23.02(3). Despite these rulings, Wellmont filed a motion on July 20, 2018, seeking to decertify the class. Wellmont argued, *inter alia*, that as "facts . . . developed" in the case, it had become apparent that HPI's claims were not typical of the class and that common issues did not predominate. Wellmont further argued that the class definition was flawed and had caused unintended consequences. On September 27, 2018, the trial court entered an order denying Wellmont's motion.

On appeal, Wellmont argues that the trial court erred by refusing to decertify the class based on Rule 23.02(3) because HPI had failed to prove classwide damages that were measurable by use of a "common methodology," citing *Comcast Corp. v. Behrend*, 569 U.S. 27, 30 (2013). HPI asserts that the rulings of this Court and the Supreme Court in the previous appeal, wherein both Courts affirmed that class certification was appropriate under Rule 23.02(3), have established the "law of the case" in this matter. Concerning HPI's postulate, our Supreme Court has elucidated:

[W]hen an initial appeal results in a remand to the trial court, the decision of the appellate court establishes the law of the case which generally must be followed upon remand by the trial court, and by an appellate court if a second appeal is taken from the judgment of the trial court entered after remand. There are limited circumstances which may justify reconsideration of an issue which was issue decided in a prior appeal: (1) the evidence offered at a trial or hearing after remand was substantially different from the evidence in the initial proceeding; (2) the prior ruling was clearly erroneous and would result in a manifest injustice if allowed to stand; or (3) the prior decision is contrary to a change in the controlling law which has occurred between the first and second appeal.

*Memphis Pub. Co. v. Tenn. Petroleum Underground Storage Tank Bd.*, 975 S.W.2d 303, 306 (Tenn. 1998) (internal citations omitted). Wellmont contends that the evidence introduced at trial was different from that promised by HPI at the time of the prior rulings concerning class certification.

Assuming, *arguendo*, that any difference exists in the proof that was promised and the proof ultimately introduced at trial, the crux of Wellmont's argument concerning decertification of the class appears to be that HPI never proved the amount of "damages incurred by its members in order to calculate HPI's damages." *See Highlands I*, 2017 WL 6623992, at *10. In proffering this argument, Wellmont appears to be merely repackaging its earlier argument concerning Mr. Kelch's reliance on Cigna's calculations as a basis for damages rather than on actual numbers derived from class members. Notably, however, Wellmont's argument in the first appeal concerning this matter was that "individualized proof to assess damages of the purported class should preclude a finding of predominance" of common questions. *See id.*

This Court disagreed with Wellmont's contention in *Highlands I*, *id.* at *10, and we likewise are not persuaded by Wellmont's new postulate that presentation of an aggregate number representing the damages of the entire class would run afoul of Rule 23.02(3)'s requirement that "question[s] of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." This Court has previously acknowledged that "where the defendant's liability can be determined on a class-wide basis because the cause of the disaster is a single course of conduct which is identical for each of the plaintiffs, a class action may be the best suited vehicle to resolve such a controversy." *Freeman*, 229 S.W.3d at 706 (quoting *Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188, 1197 (6th Cir.1987)). We conclude that Wellmont has failed to demonstrate that the trial court was required to decertify the class in this matter.

HPI also contends that the trial court erred in its certification and definition of the class by excluding the claims of any members who joined HPI after the instant lawsuit was filed. Our Supreme Court has previously stated that "[i]t is properly the trial court's prerogative to make the initial determination of and any subsequent modifications to class certification. The trial court retains significant authority to redefine, modify, or clarify the class." *Meighan v. U.S. Sprint Commc'ns Co.*, 924 S.W.2d 632, 637 (Tenn. 1996). Moreover, "the trial court retains discretion to . . . define the class." *See id.* at 639.

The trial court herein determined that it would be improper to include 151 HPI members who joined HPI after February 2, 2016, the date the complaint in this matter was filed, but before July 27, 2017, the date the class was certified. We emphasize that a trial court's determination regarding class certification is discretionary and will not be disturbed absent an abuse of discretion. *See Wofford*, 528 S.W. 3d at 537. As previously explained, a trial court abuses its discretion if it (1) applies an incorrect legal standard, (2) reaches an illogical or unreasonable decision, or (3) bases its decision on a clearly erroneous evaluation of the evidence. *See Elliott v. Cobb,* 320 S.W.3d 246, 249-50 (Tenn. 2010). Additionally, a trial court abuses its discretion if it "strays beyond the applicable legal standards or when it fails to properly consider the factors customarily used to guide the particular discretionary decision." *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010) (citing *State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007)). However, because accepting or declining a proposed class definition is a legal conclusion, we review this conclusion *de novo* with no presumption of correctness. *Id.* at 525.

Based upon our *de novo* review of this issue, we determine that the trial court did not abuse its discretion in defining the class as excluding those HPI members who joined HPI after the date upon which this lawsuit was filed. We agree with Wellmont that inasmuch as these members were unaffiliated with HPI during the time period within which Wellmont's alleged improper actions occurred, they would have no basis for an award of damages in this matter. We therefore affirm the trial court's certification of the class as it was defined by the court.

## VII. Material Evidence

Wellmont asserts that the jury's verdict should be reversed because no material evidence supported the claims of (1) breach of the SA, (2) breach of fiduciary duty, (3) intentional interference with business relationships, (4) intentional misrepresentation, or (5) intentional concealment. HPI posits that the record contains material evidence to support each of these claims. We reiterate that "[w]here the record contains material evidence supporting the verdict, the judgment based on that verdict will not be disturbed on appeal." *Reynolds*, 887 S.W.2d at 823. We shall address each claim in turn.

A.  Breach of Contract

"In a breach of contract action, claimants must prove the existence of a valid and enforceable contract, a deficiency in the performance amounting to a breach, and damages caused by the breach." *Fed. Ins. Co. v. Winters*, 354 S.W.3d 287, 291 (Tenn. 2011).  In the case at bar, the parties do not dispute that a valid contract existed between them, the SA, which was amended in 1996.  The trial court interpreted the SA, as amended, as prohibiting the parties from "competing with [the PHO] for its payors, from soliciting such payors, from becoming part of an entity which competes with [the PHO] and/or solicits [the PHO's] payors, and from sanctioning, endorsing, or promoting an organization that competes with [the PHO]."

The evidence presented at trial demonstrated that Cigna maintained an existing payor relationship with the PHO pursuant to a contract that had been in place for approximately sixteen years before it was terminated in 2013 by Cigna.  In spite of this existing relationship, on October 17, 2011, Wellmont's Chief Executive Officer (and a PHO director), Margaret DeNarvaez, signed a letter of agreement with Cigna on behalf of Wellmont.  According to Mr. Ungs, a Cigna representative, Cigna desired to create a Wellmont-focused network but wanted to contract directly with Wellmont and HPI physicians rather than with the PHO for beneficial cost reasons.  Mr. Ungs explained that Wellmont's competitor hospital, Mountain States Health Alliance, was planning to terminate its contract with Cigna because they could not agree on compensation terms.  Therefore, according to Mr. Ungs, Cigna needed either Wellmont's or Mountain States Health Alliance's hospital services to have an effective network to offer consumers.  By creating a new Wellmont-focused network, Wellmont's volume and revenue would increase.

Alice Pope, Wellmont's Chief Financial Officer and then interim director of the PHO, testified that according to her calculations, Wellmont could profit by approximately $1.4 million annually by contracting directly with Cigna in a Wellmont-focused network.  Ms. DeNarvaez, by negotiating and signing the letter of agreement with Cigna, ultimately pitted Wellmont against the PHO in competition for a contract with Cigna.  Material evidence therefore supported the jury's verdict that Wellmont breached the SA by competing with the PHO for an existing payor.

Both Ms. Pope and Mr. Kelch testified that Cigna also needed the HPI physicians in addition to Wellmont in order to have a viable network.  During her testimony, Ms. Pope acknowledged certain email communications wherein she agreed not to tell HPI that Wellmont was negotiating with Cigna directly per a directive from Ms. DeNarvaez.  Mr. Kelch related that other Wellmont representatives likewise failed to disclose the existence of Wellmont's separate agreement with Cigna.  Mr. Kelch stated that when Wellmont delayed disclosure of Cigna's new relationship with Wellmont until late 2013, many HPI

physicians were placed in an untenable position of either negotiating separate contracts directly with Cigna at reduced rates or losing patients by being considered "out of network" with Cigna in 2014.

As such, Cigna was able to save a substantial amount of money, $3.792 million annually, by contracting directly with Wellmont and HPI physicians and circumventing the PHO. In addition, Donna Lobdell, who was also employed by Wellmont and the PHO, testified that most of the employers who terminated their contracts with the PHO following Cigna's termination of its contract with the PHO did so because of financial considerations—they were able to save money by contracting with Cigna when Cigna formed its new Wellmont-focused network. By reason of these facts, material evidence also supported HPI's claim that its members were damaged by Wellmont's breach of the SA. We therefore affirm the jury's determination of Wellmont's liability concerning the breach of contract claim.

## B. Breach of Fiduciary Duty

Although Wellmont has raised as a sub-issue a lack of material evidence to support a claim of breach of fiduciary duty, we note that Wellmont failed to argue this sub-issue in the body of its appellate brief. As this Court has previously stated, we rely on the appellant to provide "[a]n argument . . . setting forth the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record . . . relied on." *Newcomb v. Kohler Co*., 222 S.W.3d 368, 400 (Tenn. Ct. App. 2006) (quoting Tenn. R. App. P. 27(a)(7)). Moreover, "[i]t is not the function of the appellate court to research and construct the parties' arguments." *Id*. "The failure of a party to cite to any authority or to construct an argument regarding his position on appeal constitutes waiver of that issue." *Id*. We therefore determine that Wellmont's sub-issue concerning the purported lack of material evidence supporting HPI's claim of breach of fiduciary duty is waived.

## C. Intentional Interference with Business Relationships

To prove a claim of intentional interference with business relationships, a plaintiff must provide evidence of the following:

(1) an existing business relationship with specific third parties or a prospective relationship with an identifiable class of third persons; (2) the defendant's knowledge of that relationship and not a mere awareness of the plaintiff's business dealings with others in general; (3) the defendant's intent to cause the breach or termination of the business relationship; (4) the

defendant's improper motive or improper means; and finally, (5) damages resulting from the tortious interference.

*Trau-Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 701 (Tenn. 2002) (footnotes and internal citation omitted). Wellmont argues that HPI has failed to show that Wellmont acted with improper motive or improper means.

In *Trau-Med*, the Supreme Court provided direction concerning the requirement of improper motive or means:

> It is clear that a determination of whether a defendant acted "improperly" or possessed an "improper" motive is dependent on the particular facts and circumstances of a given case, and as a result, a precise, all-encompassing definition of the term "improper" is neither possible nor helpful. However, with regard to improper motive, we require that the plaintiff demonstrate that the defendant's predominant purpose was to injure the plaintiff.

> Moreover, in the attempt to provide further guidance, we cite the following methods as some examples of improper interference: those means that are illegal or independently tortious, such as violations of statutes, regulations, or recognized common-law rules, violence, threats or intimidation, bribery, unfounded litigation, fraud, misrepresentation or deceit, defamation, duress, undue influence, misuse of inside or confidential information, or breach of a fiduciary relationship, and those methods that violate an established standard of a trade or profession, or otherwise involve unethical conduct, such as sharp dealing, overreaching, or unfair competition.

*Trau-Med*, 71 S.W.3d at 701 n.5 (internal citations omitted).

In the case at bar, HPI presented evidence that certain officers of Wellmont, who were also officers of the PHO, negotiated and struck a deal with Cigna separately from the PHO and to the PHO's detriment and the ultimate detriment of HPI and its members. In so doing, Wellmont breached the SA and, as the jury found, breached its fiduciary duty to HPI and its members. We therefore determine that material evidence in the record demonstrates Wellmont's improper means, and we affirm the jury's determination that Wellmont could be held liable for HPI's claim of intentional interference with business relationships.

D. Intentional Concealment

Wellmont contends that no material evidence supports HPI's claim of intentional concealment. Again, Wellmont failed to provide argument in its appellate brief concerning this sub-issue in accordance with Tennessee Rule of Appellate Procedure 27. *See Newcomb*, 222 S.W.3d at 400. Accordingly, this sub-issue is also waived. *See id*.

### E. Intentional Misrepresentation

Wellmont argues that HPI's claim of intentional misrepresentation must fail because HPI presented no proof that Wellmont made a misrepresentation to the entire class. *See, e.g., Rikos v. Procter & Gamble Co*., 799 F.3d 497, 518 (6th Cir. 2015) (explaining that pursuant to certain states' laws, a claim of intentional misrepresentation in a class action requires a showing that the defendant made the misrepresentation "in a generally uniform way to the entire class."). As our Supreme Court has explained, in order to support a claim for intentional misrepresentation, the plaintiff must demonstrate proof of the following six elements:

> (1) the defendant made a representation of an existing or past fact; (2) the representation was false when made; (3) the representation was in regard to a material fact; (4) the false representation was made either knowingly or without belief in its truth or recklessly; (5) plaintiff reasonably relied on the misrepresented material fact; and (6) plaintiff suffered damage as a result of the misrepresentation.

*Stanfill v. Mountain*, 301 S.W.3d 179, 188 (Tenn. 2009).

HPI contends that Wellmont has waived this issue by failing to object to a jury instruction stating that the misrepresentation can be made to one who is acting on the class's behalf, such as Mr. Kelch. We note, however, that Tennessee Rule of Civil Procedure 51.02 provides that a party's failure to object at trial to the content of a jury instruction given "shall not prejudice the right of a party to assign the basis of the objection as error in support of a motion for a new trial." *See Waters v. Coker*, No. M2007-01867-COA-RM-CV, 2008 WL 4072104, at *8 (Tenn. Ct. App. Aug. 28, 2008). We further note that Wellmont did object, at trial and in its motion for new trial, to the inclusion of the phrase, "or someone acting on their behalf," contained in instruction 2.40, which stated that plaintiffs would have the burden of establishing that the defendant "intentionally misrepresented and/or concealed material facts from the Plaintiffs or someone acting on their behalf."

We are therefore asked to determine whether Wellmont could properly be adjudged liable for an intentional misrepresentation that was made to someone acting on behalf of the class or whether, as Wellmont asserts, HPI would have to prove that Wellmont made a misrepresentation to every member of the class. In support of its

argument, Wellmont has provided this Court with precedent dealing primarily with issues of class certification. *See Rikos*, 799 F.3d at 518 (explaining that the question of whether the "misrepresentation [was made] in a generally uniform way to the entire class" was relevant to the issue of whether common questions of law and fact predominated over individual issues); *Valdez v. Air Line Pilots Ass'n, Int'l*, No. 2:16-CV-02256-JPM-DKV, 2017 WL 1394638, at \*9 (W.D. Tenn. Jan. 9, 2017) (explaining that the questions of "whether each class member viewed and relied upon the misrepresentations, and if so, what damages were proximately caused by that reliance" were relevant to the issue of whether common questions of law and fact predominated over individual issues); *Walker v. Sunrise Pontiac-GMC Truck, Inc.*, 249 S.W.3d 301, 312 (Tenn. 2008) (explaining that a "plaintiff can, however, have a class action certified on fraud claims based on oral misrepresentations by showing that the oral misrepresentations were uniform and that no material variations existed in the statements made to each class member."). HPI has provided this Court with no authority concerning this issue, instead relying upon its assertion of waiver.

Assuming, *arguendo*, that Wellmont would be able to demonstrate that HPI's claim of intentional misrepresentation was not a basis for Wellmont's liability because (a) HPI had to prove that Wellmont made a misrepresentation to the entire class and (b) there was no proof thereof, we conclude that such a demonstration would produce no different result in this action. HPI set forth numerous claims against Wellmont, and the jury found the existence of at least seven separate bases for Wellmont's liability. The jury was then asked to assess damages against Wellmont predicated on its determination that even one of those claims had been proven. The jury did so. Consequently, it is clear that the existence of a single basis for Wellmont's liability would support the jury's verdict. This Court has herewith affirmed four separate bases. Having determined that sufficient material evidence in the record supports the jury's verdict regarding several of HPI's claims, *see Reynolds*, 887 S.W.2d at 823, we conclude that this issue is moot.

## VIII. Post-Judgment Determinations

### A. Attorney's Fee Award

Wellmont argues that the trial court erred by awarding $5.6 million in attorney's fees and expenses to HPI, pursuant to a fee-shifting provision in the SA, because HPI failed to present proof that Wellmont breached the SA and because HPI failed to submit the issue of attorney's fees to the jury. The relevant section of the SA pertaining to attorney's fees reads as follows:

> In the event of any action or arbitration proceedings to enforce any provision of this Agreement or to secure or preserve the rights of any party against any other party to any

> property which is the subject of this Agreement, the **prevailing party will be entitled to recover reasonable attorneys fees, court costs and expenses** of arbitration and litigation expended in the prosecution or defense thereof.

(Emphasis added.) Wellmont contends that because it did not breach the SA, HPI was not entitled to an award of attorney's fees as a "prevailing party." Having previously determined that material evidence supported the jury's determination that Wellmont breached the SA, however, we find Wellmont's position concerning this sub-issue to be unavailing.

We note further that absent a contractual agreement or statutory provision to the contrary, the "American Rule" requires litigants to pay their own attorney's fees and costs. *Fannon v. City of Lafollette*, 329 S.W.3d 418, 432 (Tenn. 2010). Notwithstanding, this Court has held that "[w]hen a contract provision provides for the recovery of attorney's fees from the unsuccessful party in the event litigation arises, the prevailing party is entitled to enforcement of the contract according to its express terms." *Clark v. Rhea*, No. M2002-02717-COA-R3CV, 2004 WL 63476, at *2 (Tenn. Ct. App. Jan. 13, 2004) (citing *Wilson Mgmt. Co. v. Star Distribs. Co.*, 745 S.W.2d 870, 873 (Tenn. 1988)). Moreover, our Supreme Court has held that although "our courts do not have discretion to deny an award of fees mandated by a valid and enforceable agreement between the parties, nothing in this decision affects or limits the discretion our courts have in determining the reasonableness and appropriate amount of such awards . . . ." *Eberbach v. Eberbach*, 535 S.W.3d 467, 479 (Tenn. 2017) (explaining that because the wife was the prevailing party in post-divorce proceedings, she was entitled to attorney's fees under a fee-shifting provision in the parties' marital dissolution agreement).

Inasmuch as HPI was the prevailing party in this litigation, HPI was entitled to recover its reasonable attorney's fees and expenses expended in the prosecution of this action per the fee-shifting provision contained in the SA. We next consider Wellmont's contention, however, that under Tennessee law the issue of the amount of attorney's fees to be awarded should have been decided by the jury rather than the trial court.

Wellmont relies on various rulings from this Court in support of its argument that the jury, rather than the trial court, must determine the amount of an attorney's fee award, including *Kozy v. Werle*, 902 S.W.2d 404 (Tenn. Ct. App. 1995); *McCormic v. Smith*, 668 S.W.2d 304 (Tenn. Ct. App. 1984) ("*McCormic II*"); and *Childress v. Union Realty Co.*, No. W2003-02934-COA-R3-CV, 2005 WL 711960 (Tenn. Ct. App. Mar. 28, 2005). These decisions were subsequent to our Supreme Court's opinion in *McCormic v. Smith*, 659 S.W.2d 804 (Tenn. 1983) ("*McCormic I*"), wherein the Court remanded to this Court

the question of the propriety of an attorney's fee award made by the trial court rather than the jury.

*McCormic I* and *II* involved a claim filed pursuant to the Uniform Residential Landlord and Tenant Act, and the plaintiffs alleged in their complaint that they were entitled to compensatory damages, punitive damages, and attorney's fees based on that statute. *See McCormic II*, 668 S.W.2d at 305. Significantly, the plaintiffs also demanded a jury to try all issues. *Id.* The jury returned a verdict for the plaintiffs for compensatory and punitive damages, also determining that the plaintiffs were entitled to an award of attorney's fees but failing to set the amount. *Id.* Following trial, the trial court considered an affidavit from the plaintiffs' attorney and set the amount of the fee award based on that affidavit. *Id.* at 306.

When the *McCormic* defendants attempted to appeal the fee award, this Court initially refused to hear the appeal because the defendants had not filed a motion for new trial. *See McCormic I*, 659 S.W.2d 805. The defendants appealed to the Supreme Court, and the High Court reversed and remanded the case to this Court, stating in pertinent part:

> The fee fixed by the trial judge in the present case was not fixed by the jury nor was the amount thereof even submitted for jury consideration, insofar as we can ascertain. Unless appellants otherwise waived the issue or in some other manner acquiesced in the procedure followed by the trial judge, the question should have been considered by the Court of Appeals. We specifically hold that appellants did not waive the issue by failing to file a motion for a new trial or other motion under Rule 59, T.R.C.P.

*Id.* at 806.

Following remand in *McCormic II*, this Court held that because the parties had requested that the jury try all disputed issues of fact, the trial judge erred in failing to instruct the jurors that it was their duty to determine the amount of the fee award. *See McCormic II*, 668 S.W.2d at 306. This Court explained:

> A party to a lawsuit has the right to have all disputed issues of fact decided by a jury. *Morgan v. Tennessee Central Railway Co.,* 31 Tenn. App. 409, 422, 216 S.W.2d 32, 37 (1948).
>
> Here the parties demanded a jury to try all disputed issues of fact including whether plaintiffs were entitled to attorney's fees and, if so, the amount. The Trial Judge erred in failing to instruct the jury that it was their duty to decide the amount of attorney's fees after they had returned a finding that plaintiffs were entitled to attorney's fees. It was error for the

Trial Judge to take the issue of the amount of attorney's fees from the jury and decide that issue upon affidavits submitted by plaintiffs. The parties were entitled to have all issues of fact decided by the jury, including the amount of attorney's fees.

*Id.* This Court thereby reversed the fee award and remanded the matter to the trial court for a jury trial concerning the appropriate amount of fees to be awarded to the plaintiffs. *Id.*

This same rule was followed in *Kozy*, 902 S.W.2d at 406, wherein the plaintiff sought to recover on a promissory note and also requested an award of attorney's fees, pursuant to a fee-shifting provision contained in the note, when he filed his original action in general sessions court. During the subsequent appeal to circuit court, the defendant demanded that a jury try all issues. *Id.* After a directed verdict was granted in the plaintiff's favor during trial, the circuit court dismissed the jury and subsequently determined the amount of attorney's fees to be awarded to the plaintiff. *Id.* On appeal, this Court determined that the trial court lacked authority to resolve such issue without the jury and reversed the award, stating:

It is clear from the record that the case was closed and verdict and judgment rendered without any presentation to the court or jury of a request for attorneys' fees or evidence in support thereof.

On March 3, 1994, plaintiff's attorney filed his "application for attorneys' fees" with supporting affidavit. While this application was filed within the time allowed for post-trial motions, it presented an issue as to which a jury had been demanded, but no evidence had been submitted to the jury. Under these circumstances, the Trial Court was not authorized to resolve a jury issue without the interposition of a jury. This is especially true because the defendant filed counter affidavits raising a genuine issue as to the amount of fee to be awarded. Defendant also moved to strike the application for fees in response to which the Trial Court in its order of April 29, 1994, stated "the amount of fees to be awarded shall be determined by the Trial Judge."

Thus, it cannot be said that the determination of fees without a jury was by mutual consent or acquiescence.

*Id.* at 412.

In *Childress*, this Court was asked to determine whether the trial court's denial of an award of attorney's fees was proper. *See Childress*, 2005 WL 711960, at *1. The

*Childress* plaintiff had filed an action against his landlord asserting breach of a commercial lease, which also contained a fee-shifting provision. *Id*. A jury awarded the plaintiff $168,000 in damages. *Id*. Subsequently, the plaintiff filed a motion requesting an award of discretionary costs, attorney's fees, pre-judgment interest, and post-judgment interest. *Id*. at *2. The trial court denied the plaintiff's request for attorney's fees, and this Court affirmed, explaining that no evidence had been presented to the jury regarding attorney's fees even though both parties asked that the jury decide all issues of fact. *Id*. at *7; *see also Davis v. Martin*, No. 03A01-9409-CH-00350, 1995 WL 48461, at *2 (Tenn. Ct. App. Feb. 8, 1995) ("Where the amount of fees are disputed, and a jury is timely demanded to establish the amount of fees, a Court may not arrogate unto itself the issues of determining the amount. The issues must be submitted to the jury along with appropriate instructions.").

In the case at bar, HPI specifically requested a "trial by jury on all counts to which a right to jury trial applies." As previously stated, the amount of an attorney's fee award is a question of fact that should be submitted to a jury when such is requested by a party. *See McCormic*, 668 S.W.2d at 306. HPI admittedly presented no evidence concerning attorney's fees to the jury, and the trial court did not instruct the jury to set the amount of an award of fees following its determination of liability. In other words, although HPI's entitlement to an award of attorney's fees was determined by the jury's decision that HPI had prevailed on its claims, based on the SA's fee-shifting provision, the jury was not asked to determine the proper amount of the fee award.

HPI argues that Wellmont acquiesced in the procedure of permitting the trial court to determine the proper amount of an award of attorney's fees following pronouncement of the jury's verdict establishing liability. Our review of the record does not reveal such consent. As Wellmont points out, it was not Wellmont's duty to ensure that evidence concerning the fee issue was presented to the jury. HPI also provides this Court with a list of cases wherein it appears that the trial court determined the amount of attorney's fees to be awarded after a jury had pronounced a verdict of liability. We note that in these cases, however, the specific issue of whether fee awards had to be adjudicated by the jury or the court was not raised. *See, e.g., Killingsworth v. Ted Russell Ford, Inc*., 104 S.W.3d 530 (Tenn. Ct. App. 2002); *Leverette v. Tenn. Farmers Mut. Ins. Co*., No. M2011-00264-COA-R3-CV, 2013 WL 817230 (Tenn. Ct. App. Mar. 4, 2013); *Lowe v. Johnson Cty*., No. 03A01-9309-CH-00321, 1995 WL 306166 (Tenn. Ct. App. May 19, 1995).

Based on this precedent, we conclude that the trial court erred by failing to submit the issue of the proper amount of attorney's fees and expenses to the jury for determination. We therefore vacate the trial court's award of attorney's fees and remand this issue to the trial court for determination by a jury. *See McCormic*, 668 S.W.2d at

306. HPI's issue concerning the amount of attorney's fees should also be resolved upon remand.

### B. Restraining Order

Wellmont posits that the trial court erred by entering a restraining order, which permanently enjoined Wellmont "from engaging in any conduct inconsistent with the terms of the Court's Findings regarding [the SA]" and "from retaliating against HPI, its members, and the witnesses in this lawsuit (i) for participation in this lawsuit; (ii) for testimony given in this lawsuit; or [(iii)] in general, for advancing the interest of the [PHO] or HPI in this lawsuit." Wellmont asserts that such injunctive relief was inappropriate because HPI had an adequate remedy via the damages award and would not suffer irreparable harm. Additionally, Wellmont contends that the trial court failed to make the necessary findings to support the injunction, which Wellmont argues is vague and overbroad.

We note that a "trial court's decision regarding whether to grant injunctive relief is reviewed under an abuse of discretion standard." *Vintage Health Res., Inc. v. Guiangan*, 309 S.W.3d 448, 466 (Tenn. Ct. App. 2009). In support of its argument that the trial court abused its discretion in this case, Wellmont relies upon this Court's opinion in *Alexandria-Williams v. Goins*, No. W2018-01024-COA-R10-CV, 2018 WL 3198799, at *2 (Tenn. Ct. App. June 26, 2018), wherein this Court stated:

> The decision to grant an injunction should not be a perfunctory one. In fact, our Supreme Court noted long ago as follows: "[I]n reference to the discretion as to granting injunctions, it is said by Mr. Justice Baldwin, 'there is no power the exercise of which is more delicate, which requires greater caution, deliberation and sound discretion or is more dangerous in a doubtful case.'" *Mabry v. Ross*, 48 Tenn. 769, 774 (1870) (quoting 2 Story Eq. Jur., sec. 959). "When a trial court decides to grant an injunction, several factors are to be considered such as the danger of irreparable harm, the inadequacy of other remedies, the benefit to the plaintiff, the harm to the defendant, and the public interest." *Zion Hill Baptist Church v. Taylor*, No. M2002-03105-COA-R3-CV, 2004 WL 239760, at *5 (Tenn. Ct. App. Feb. 9, 2004) (citations omitted). Findings of fact and conclusions of law regarding such factors should be made incident to a decision on injunctive relief. This is true even when injunctive relief is awarded on a preliminary basis. With respect to this point, we note that under Rule 65.04(6) of the Tennessee Rules of Civil Procedure, a court is required to "set forth findings of fact and conclusions of law which constitute the grounds of its action as required by Rule 52.01" when granting, denying, or modifying a temporary injunction. Tenn. R. Civ. P. 65.04(6).

- 55 -

The *Alexandria-Williams* Court ultimately vacated the injunction entered by the trial court in that case, determining that the "order entered by the trial court contain[ed] no findings of fact or conclusions of law whatsoever regarding the foundation for the issuance of the injunction." *Id.* at *2.

In the case at bar, the trial court made the following findings in the restraining order entered on March 28, 2019:

1.  The Stockholders' Agreement ("SA") §3.2.2 prohibits Wellmont from competing with [the PHO] for payors with existing [PHO] contracts and from soliciting such payors, and the exception in SA §3.2.2(i) for "competing" networks allows only competition for and solicitation of persons or entities which do not have networks composed of [PHO] personnel.

2.  The jury found that Wellmont breached SA §3.

3.  The jury found that HPI members are third-party beneficiaries of SA §3.

4.  The jury found that Wellmont has breached its fiduciary duties of care and loyalty to HPI and its members.

5.  The jury found that Wellmont committed an intentional tort damaging HPI and its members.

    So that Wellmont does not repeat such conduct, the Court, hereby, ENJOINS Wellmont from engaging in any conduct inconsistent with the terms of the Court's Findings regarding SA §3 above. The Court also ENJOINS Wellmont from retaliating against HPI, its members, and the witnesses in this lawsuit (i) for participation in this lawsuit; (ii) for testimony given in this lawsuit; or [(iii)] in general, for advancing the interest of the [PHO] or HPI in this lawsuit.

We determine that the trial court's findings of fact and conclusions of law delineated in the restraining order provided a sufficient foundation to support the injunctive relief issued. Having determined that Wellmont had breached the SA and its fiduciary duty by competing with the PHO for an existing payor and damaging HPI and its members in the process, we further determine that the court was warranted in prohibiting such conduct in the future. Having found that Wellmont had engaged in prior tortious conduct, the court

was also justified in enjoining Wellmont from acts of retaliation against HPI, its members, and other witnesses who had regular business dealings with Wellmont.

It is clear that Wellmont had the ability to cause damage to HPI and its members by its business decisions. Equally clear is that irreparable harm could be inflicted upon individual physicians as well as HPI. We therefore conclude that the trial court did not (1) apply an incorrect legal standard, (2) reach an illogical or unreasonable decision, or (3) base its decision on a "clearly erroneous assessment of the evidence." *See Beecher*, 312 S.W.3d at 524. Moreover, we determine that the language of the restraining order is not vague and overbroad; rather, we find that it is "specific in terms and . . . describe[s] in reasonable detail, and not by reference to the complaint or other document, the act restrained or enjoined." *See* Tenn. R. Civ. P. 65.02. We therefore find Wellmont's argument concerning the restraining order to be unavailing.

C. Prejudgment Interest

HPI contends that the trial court erred by declining to award prejudgment interest. Tennessee Code Annotated § 47-14-123 (2013) provides in pertinent part:

> Prejudgment interest, i.e., interest as an element of, or in the nature of, damages, as permitted by the statutory and common laws of the state as of April 1, 1979, may be awarded by courts or juries in accordance with the principles of equity at any rate not in excess of a maximum effective rate of ten percent (10%) per annum; provided, that with respect to contracts subject to § 47-14-103, the maximum effective rates of prejudgment interest so awarded shall be the same as set by that section for the particular category of transaction involved. In addition, contracts may expressly provide for the imposition of the same or a different rate of interest to be paid after breach or default within the limits set by § 47-14-103.

We emphasize that "an award of prejudgment interest is within the sound discretion of the trial court." *Myint*, 970 S.W.2d at 927. As this Court has previously explained:

> Trial courts are not without guiding principles in exercising their discretion to award pre-judgment interest. First, they are guided by principles of equity. *Id.* (citing Tenn. Code Ann. § 47-14-123).

> Simply stated, the court must decide whether the award of prejudgment interest is fair, given the particular circumstances of the case. In reaching an equitable decision, a court must keep in mind that the purpose of awarding the

- 57 -

interest is to fully compensate a plaintiff for the loss of the use of funds to which he or she was legally entitled, not to penalize a defendant for wrongdoing. *Mitchell v. Mitchell*, 876 S.W.2d 830, 832 (Tenn. 1994); *Otis [v. Cambridge Mut. Fire Ins. Co.*, 850 S.W.2d [439,] 446 [(Tenn. 1992)].

*Id*. The Tennessee Supreme Court has noted two other guiding principles for determining whether an award of pre-judgment interest is proper:

> In addition to the principles of equity, two other criteria have emerged from Tennessee common law. The first criterion provides that prejudgment interest is allowed when the amount of the obligation is certain, or can be ascertained by a proper accounting, and the amount is not disputed on reasonable grounds. *Mitchell*, 876 S.W.2d at 832. The second provides that interest is allowed when the existence of the obligation itself is not disputed on reasonable grounds. *Id*. (citing *Textile Workers Union v. Brookside Mills, Inc*., 205 Tenn. 394, 402, 326 S.W.2d 671, 675 (1959)).

*Id*.

> The supreme court has further elaborated on the "certainty" criterion. While the certainty of the existence or amount of an obligation supports an award of pre-judgment interest, the uncertainty of either the existence or the amount of the obligation does not mandate its denial. *Id*. at 928. "[T]he test is whether the amount of damages is ascertainable by computation or by any recognized standard of valuation. This is true even if there is a dispute over monetary value or if the parties' experts compute differing estimates of damage." *Id*. (citing *Cmty. State Bank v. O'Neill*, 553 N.E.2d 174, 177-78 (Ind. Ct. App. 1990); *Unlimited Equip. Lines v. Graphic Arts Ctr., Inc*., 889 S.W.2d 926, 942-43 (Mo. Ct. App. 1994)).

*Childress*, 2005 WL 711960, at *3-4.

In this matter, the trial court denied HPI's request for prejudgment interest, finding no basis for such an award for the following reasons:

1. The denial of prejudgment interest serves the interest of justice and equity considering the Court's other rulings in this case.

2.      The amounts of the alleged obligations were uncertain, and the existence of the obligations themselves was disputed on legitimate and reasonable grounds.

Based upon our thorough review of the record, we do not find that the court's decision to deny prejudgment interest constituted a "manifest and palpable abuse of discretion." *See id.* The trial court noted considerations of equity in its decision in addition to its findings that the amount of the obligation was uncertain and that the existence of the obligation was disputed on legitimate grounds. *See id.* We therefore affirm the trial court's denial of HPI's request for prejudgment interest.

### D.  HPI's Motion for Partial Removal of Stay

Following the filing of this appeal, HPI filed a motion requesting that this Court partially remove a stay entered by the trial court on January 22, 2019, preventing payment of the damages award and enforcement of the restraining order. HPI asserted that because Wellmont had not appealed the portion of the judgment awarding HPI $550,150 in overdue tithes, HPI should be allowed to collect that portion of the judgment. Inasmuch as this appeal has now been fully addressed by this Court, we conclude that this issue will be more appropriately determined by the trial court upon remand.

### IX.  Conclusion

For the foregoing reasons, we vacate the trial court's award of attorney's fees and expenses to HPI and remand that issue to the trial court for determination by a jury. We affirm the remainder of the trial court's judgment. Costs on appeal are assessed to Wellmont. This case is remanded to the trial court for enforcement of the judgment; further proceedings consistent with this opinion, as necessary; and collection of costs below.

_____
THOMAS R. FRIERSON, II, JUDGE